Ronald G. Schmidt, #4-4167
Schmidt Legal Services Prof LLC
1719 W. Main Street
Rapid City, SD 57702
Cellular: (605) 484-4048
Law office: (605) 341-0112
schmidtlaw@rushmore.com
*Attorney for Plaintiff Saddletree Holding, LLC*

| | | |
|---|---|---|
| STATE OF WYOMING | ) | IN THE DISTRICT COURT |
| | )ss. | |
| COUNTY OF WESTON | ) | SIXTH JUDICIAL DISTRICT |

| | |
|---|---|
| SADDLETREE HOLDING, LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EVANSTON INSURANCE COMPANY, | ) |
| MARKEL SERVICE, INCORPORATED, | ) |
| MARKEL CORPORATION, RIMKUS | ) |
| CONSULTING GROUP, INC., AND | ) |
| FRONTIER ADJUSTERS | ) |
| | ) |
| Defendants. | ) |

cv-CV-2145

FILED IN DISTRICT COURT
WESTON COUNTY, WYOMING

MAR 16 2022

TINA COTE
CLERK OF DISTRICT COURT

**COMPLAINT**

Plaintiff, by and through its undersigned attorney, for its Complaints against the above-named Defendants, allege and state as follows:

<u>THE PARTIES</u>

1.     Plaintiff Saddletree Holdings, LLC, is a Wyoming limited liability company, 554 Arch Creek Road, Upton, Weston County, Wyoming 82730, and is the Insured on policy number 2AA132775 issued by Defendant Evanston Insurance Company.

2.      Defendant Evanston Insurance Company is an Illinois corporation, 10 Parkway North, Suite 100, Deerfield, Illinois, 60015, and its financial and operational affairs are controlled by Defendant Markel Corporation.

3.      Defendant Markel Services, Incorporated, is a Virginia corporation with the identical address as Markel Corporation, 4521 Highwoods Parkway, Glen Allen, Virginia, 23060, and is the claims service and adjuster for Evanston Insurance Company.

4.      Defendant Markel Corporation is a Virginia corporation, 4521 Highwoods Parkway, Glen Allen, Virginia, 23060, which controls the financial and operational affairs of Defendants Evanston Insurance Company and Markel Service, Incorporated.

5.      Pursuant to insurance policy form MEIL 1200-10-16, any action against Evanston Insurance Company alleging the failure of the Company to pay any amount claimed to be due, shall be initiated by Service of Process made upon the Secretary, Legal Department, Markel Service, Incorporated, 10 Parkway North, Suite 100, Deerfield, Illinois, 60015, the identical address for Defendant Evanston Insurance Company, *supra*.

6.      Markel Service, Incorporated, as adjuster for Evanston Insurance Company acknowledged receipt of Plaintiff's claim for money due under the policy, and, as hereafter alleged, denied this claim for benefits absent any reasonable basis for denial, and with knowledge or reckless disregard of the lack of any reasonable basis for denying the claim.

7.      Defendant Rimkus Consulting Group, Inc. has offices located at 8100 Akron Street, Suite 320, Centennial, Colorado, 80112.  Markel Service, Incorporated, requested Bryan Baggaley, P.E., to assist in the evaluation of Plaintiff's claim which arose in Wyoming. Mr. Baggaley is a registered professional engineer with emphasis on structural engineering with

Wyoming registration no. 16799. Mr. Baggaley, as hereafter alleged, broached professional engineering standards.

8.    Defendant Frontier Adjusters, 3020 Stockade Drive, Rapid City, SD, 57702, was referred the inspection of Plaintiff's property by Markel Service, Incorporated to assist it with the adjustment of the claim. This Defendant, as hereafter alleged, received Mr. Baggaley's July 17, 2019 Report and negligently failed to instruct Markel Services, Incorporated to warn Plaintiff of the dangerous condition of the building and as further alleged.

VENUE, JURISDICTION AND PROCESS

9.    Section 26-15-134, WSA, states suits upon causes of action arising within Wyoming against an insurer over an insurance policy shall be brought in the county where the cause of action arose or in the county where the policyholder instituting the action resides.

10.    Here, the insured property was located in, and the insured resides in Weston County, Wyoming.

11.    Insurance is exclusively a matter of state law, and there is no federal jurisdiction.

12.    Jurisdiction is fully vested in the District Court under the Wyoming Constitution and statutory law.

13.    Sections 26-3-121 and 122, WSA, provide each insurer shall appoint the commissioner of insurance as its attorney to receive service of legal process issued against the insurer in Wyoming, and shall designate the person to whom process against it served upon the commissioner is to be forwarded.

14.    Policy Form MEIL 200-10-16 provides if the statute of any state (here §§26-3-121 and 122, WSA) makes provision therefor, Evanston Insurance Company designates the Commissioner of Insurance of that state as its true and lawful attorney upon whom may be

3

served any lawful process in any action instituted by or on behalf of the Named Insured arising

out of the policy, and designates the Secretary, Legal Department, Markel Services,

Incorporated, 10 Parkway North, Deerfield, Illinois, 60015, as the person to whom the

Commissioner is authorized to mail such process or a true copy thereof.

15.     Markel Service, Incorporated failed to comply with §26-9-135, WSA, to

Plaintiff's detriment and damage.

GENERAL ALLEGATIONS

A.     Claims Against Defendants Evanston Insurance Company, Markel
       Service, Incorporated and Markel Corporation

16.     Defendant Markel Corporation controlled the financial and operational policies

and affairs of both Evanston Insurance Company and Markel Service, Incorporated and was

either grossly negligent or acted in bad faith in its supervision and control of those companies

adjusting policies, claim payment and compliance with Wyoming law as alleged herein.

17.     The relevant policy forms are attached hereto as Exhibit "A".

18.     Policy Form MEIL 1000-08-11 provides this insurance contract is issued pursuant

to Wyoming Insurance Laws.

19.     Policy Form MPIL 1041-02-12 describes How to File a Claim on the appropriate

Accord form, and states supplemental information or questions on existing claims be emailed to

markelclaims@markelcorp.com which, as mentioned, has the identical mailing address as

Markel Services, Incorporated and controls its financial and operational affairs.

20.     The producing agent, Mark Wilson of Farmers Insurance of Buffalo, Wyoming,

completed and submitted Plaintiff's Accord Property Loss Notice of Claim on May 7, 2019.

4

21.     On May 9, 2019, Lynne Wood at markel.com emailed newclaims@markel.com to set this claim up under policy number 2AA132775-0, and assign to a first party property adjuster. The email states services provided through Markel Service, Incorporated.

22.     On May 20, 2019, Kim Cummins, client account manager at Big Sky Underwriters emailed Mark Wilson, the producing agent, that the carrier had not acknowledged receipt of the claim, but the claim department informed her, in part: "Adjuster: Harvey Goodman".

23.     On July 17, 2019, Bryan Baggaley of Rimkus Consulting Group, Inc., issued its Report of Findings prepared for Frontier Adjusters as requested by Harvey Goodman. (Exhibit "B" relevant pages from July 17, 2019 Rimkus Report)

24.     The Rimkus Report CONCLUSIONS at page 2 are stated as follows:

> "1. Sagging of the roof and buckling of the wall columns was caused by improper design and construction of the building. Specifically, the building was not designed and/or constructed adequately to support the required minimum design snow load on the roof of the structure. The building was designed and constructed by Dream Carport and Buildings, Inc.
>
> 2. The roof and support columns of the building buckled under the weight of the snow during the 2018-2019 snow year due to inadequate design and construction noted above." (Emphasis added)

25.     The Report at page 8 states:

> "The buckling of these members is considered a structural failure and severely weakens the member capacity to carry loads. Due to these conditions, Rimkus recommends that the structure not be occupied during any months where snow on the roof of the structure may occur. (Emphasis added)

26.     On July 27, 2019 (just 10 days after the issuance of the Rimkus Report) adjuster Goodman wrote Plaintiff disclaiming coverage and denying payment under the policy. (Exhibit "C")

27.     Adjuster Goodman refers the "inspection" of the damage to Andy Schultz of Frontier Adjusters to assist in the adjustment of the claim. Schultz inspected the property on May 15, 2019.

28.     Goodman further states Bryan Baggaley of Rimkus was requested to assist in the evaluation of the loss. Baggaley inspected the structure on June 6, 2019.

29.     In his conclusion, Goodman stated the disclaimer of coverage was based on policy language set forth in the letter, and "the information provided by the Rimkus engineer". (The policy language relied on to disclaim coverage will subsequently be discussed.)

30.     On September 27, 2019, Plaintiff's then attorney, Sean Durrant of Buffalo, WY, wrote Goodman stating he had the July 27, 2019 denial of claim letter, stating as a result Saddletree was faced with submitting a claim against the building manufacturer, and requested a copy of the Rimkus Report which Markel Claims based its decision to deny the claim. Durrant had checked with the Wyoming Department of Insurance and was advised that "the insured is entitled to a copy of the engineering report from Rimkus Consulting and any other materials that Markel-Claims relied upon in arriving at its decision to deny the claim."

31.     Defendant Markel Service, Incorporated refused this request.

32.     On July 8, 2021, the undersigned counsel wrote Goodman attaching a copy of Durrant's September 7, 2019 request for a copy of the Rimkus Report admittedly relied on by Markel Service to deny the claim as stated in his July 27, 2019 letter disclaiming coverage. The letter demanded a copy of the Rimkus Report, all communications to and from Frontier

6

Adjusting and Bryan Baggaley/Rimkus Consulting, and all materials relied on to disclaim

coverage to which Saddletree was entitled as verified by the Wyoming Commissioner of

Insurance.

     33.    On August 10, 2021, Goodman emailed attaching a copy of the Rimkus Report

and admitting "It was specifically used to evaluate the claim presented by Saddletree Holdings

and substantiate our position as outlined in our July 27, 2019 letter of explanation to our

policyholder. We will be unable to address the other requests in your letter of July 8, 2021."

(Emphasis added)

     34.    The refusal by Markel Service, Incorporated, to furnish the Frontier Adjusters and

Baggaley/Rimkus Consulting, communications and other material relied on to deny the claim as

requested with its refusal to respond to Durrant's September 27, 2019 request for the Rimkus

Report and other material relied upon to deny the claim, knowing Rimkus had found the building

unsafe for occupancy by the public for all months where snow on the roof could cause the

building to collapse, and knowing it had failed to warn Saddletree of Rimkus's recommendation

and danger (as well as misrepresenting the policy provisions requiring coverage as will be

shown) is clear on the face of its July 27, 2019 disclaimer and refusal to pay under the policy,

constitutes tortious breach of contract and bad faith, gross negligence, fraud and/or deceit, and

was unreasonable and without cause.

     35.    Durrant specifically told Goodman in the September 27, 2019 letter that due to the

denial Saddletree faced submitting a claim with Dreams Carport and Building, Inc., the designer

and contractor for the building.

     36.    The July 17, 2019 Rimkus Report (received ten (10) days before Goodman's July

27, 2019 claim denial letter, and approximately a month after Durrant's request for the Rimkus

Report) signed and sealed by Bryan Baggaley, a registered WY professional structural engineer,

rendering his opinions as to Dreams liability as follows:

> "Specifically, the building was not designed and/or constructed <u>adequately to support the required minimum design snow load</u> on the roof of the structure. <u>The building was designed and built by Dreams Carport and Buildings, Inc.</u>" (Emphasis added)

37.    The Commercial Property Conditions Form CP-00-90-07-88 contains subrogation

provision reading as follows:

> "If any person or organization to or for whom we make payment under this coverage part has rights to recover damages to another, those rights are transferred to us to the extent of our payment."

38.    Thus, if Markel Services, Incorporated had honored its coverage and payment, it

would have had the right to sue Dreams and its expert structural engineer, Bryan Baggaley to

testify as to liability and damage.

39.    As a result of the denial of payment, Saddletree had to retain an expert structural

engineer and incur those costs, together with legal fees, and other costs and expenses which

should have been incurred by Evanston Insurance Company under its subrogation rights.

Our firm's legal fees and expenses to date are $66,322.36, which together with interest is

mounting.

The fees and expenses of Albertson Engineering, our expert structural engineer, to date

are $25,594.61 which together with interest, is mounting.

40.    On December 17, 2021, Mr. Goodman, responding to Plaintiffs October 27, 2019

request for reconsideration, <u>reconfirmed</u> the coverage disclaimer. (Exhibit "D")

41.    On January 4, 2022, Plaintiff responded to Markel Service, Incorporated's

December 17, 2021 re-confirmation of the coverage disclaimer. (Exhibit "E")

42.    In its December 17, 2021 re-confirmation of coverage disclaimer, Defendant
Markel Service, Incorporated failed to even respond to its alleged breach of its independent duty
to warn Plaintiff, its insured, of the unsafe and dangerous condition of the structure, and the
finding and conclusion of its expert structural engineer Rimkus that recommended the structure
not be occupied during any months where snow on the roof of the structure may occur causing it
to further collapse (*See*, Exhibit "B" at p. 8), which Report was dated ten (10) days before this
Defendant's July 27, 2019 disclaimer of coverage.  Rimkus also concluded the building was
designed and constructed by Dreams Carports and Buildings, Inc., and the roof and support
columns of the building buckled under the weight of snow during the 2018/2019 snow year "due
to the inadequate design and construction" (Id. at p. 2)

43.    Thus, by disclaiming coverage, and subsequently refusing to furnish the Rimkus
Report to Plaintiff's former attorney as requested September 30, 2019 (knowing counsel desired
the Report due to the disclaimer of coverage, and the resulting need to sue the designer and
contractor which Rimkus had found negligent), this Defendant (a) covered-up its abject failure to
warn Plaintiff, its insured, of the unsafe and dangerous condition, and potential for further
collapse of the structure, and (b) transferred its subrogation duty (having Rimkus as an expert on
liability) to Plaintiff who incurred the legal and expert and related fees and expenses and risk;
and (c) disingenuously omits, or takes relevant policy coverage language out-of-context to avoid
coverage and payment.

44.    Markel's denial of coverage and payment and refusal to warn were unreasonable
and without just cause, willful or wanton bad faith, and/or grossly negligent.

45.    §26-15-124, WCA, provides in any action or proceedings commenced against any
insurance company on any insurance policy of any kind of insurance, if it is determined that the

9

company refuses to pay the full amount of a loss covered by the policy and that the refusal is unreasonable or without cause, any court in which judgment is rendered for a claimant may also award a reasonable sum as an attorney's fee and interest at ten percent (10%) per year.

POLICY COVERAGE

46.     The July 27, 2019 Markel Service, Incorporated disclaimer of coverage and refusal to pay the policy benefits is based on specific, selective portions of Contract Form CP-00-10(10-12) BUILDING AND PERSONAL PROPERTY COVERAGE Sections A.1.b., and Form 10-30(10-12) CAUSES OF LOSS – SPECIAL FORM  Sections A.1.2., B.2.d.(1).(2).3.a.b., and C.1.c.(1)(2). (*See*, referenced policy provisions as set forth in the policy attached as Exhibit "A")

47.     Form CP-00-10-16-12 sections A.1.a. and b. simply define the property covered by the policy.  Subsection a. defines the scope of the "Building" coverage, and subsection b. the scope of the "Business Personal Property" coverage.  There is no dispute concerning their applicability.

48.     Section A.3. of this Form is entitled "Covered Causes of Loss" and refers to Causes of Loss Form CP-10-30-10-12.

49.     The July 27, 2019 Markel letter sets forth selected provisions of this Form at pages 2 and 3 as the sole grounds for the disclaimer of coverage and refusal to pay under the policy, in applying the findings and conclusions of the Rimkus Report.

50.     Section A. of this Form states "Covered Causes of Loss Means RISKS OF DIRECT LOSS unless the loss is 1.  Excluded in Section B., Exclusions; or limited in Section C., Limitations.

51.     Markel limits its reliance on Section B. to subsection 2.d.(1)(2), and 3.a.b. and c.(1) through (4).

10

52.     Subsection 2.d.(1) relates to "wear and tear" which is inapplicable.

53.     Markel limits its reliance on Section B. to subsections 2.d.(1)(2), and 3a.b. and c.
(1) through (4).

54.     Subsection 2.d.(2) relates to "Rust, corrosion, fungus, decay, deterioration, hidden
or latent defect or any quality that causes it to damage or destroy itself." (Emphasis added)

55.     The Rimkus Report makes it clear the building did not destroy itself.  Rimkus
Conclusion 2 at page 2 of its Report (together with many other findings throughout the Report)
states, "The roof and support columns of the building buckled under the weight of the snow
during the 2018/2019 snow year due to the inadequate design and construction noted above."
(Emphasis added)  But for the "weight of the snow" the building would not have collapsed or
caved in.  As will be seen, damage caused by "weight of the snow" is a covered loss.
Subsections B.2.d.(1) and (2) are inapplicable.

56.     Markel next relies on Sections B.3.a.b. and c. for its denial of coverage and
refusal to pay.

57.     Section B.3. is the primary basis for Plaintiffs disputing the honesty and integrity
of Markel's disclaimer of coverage and refusal to pay the policy benefits.  As the expert,
exclusive adjuster with years of experience and knowledge of Evanston Insurance Company's
policy provisions, it could not have unintentionally misrepresented the coverage provisions as it
did.

58.     Section B.3. reads as follows:

> "We will not pay for loss or damage caused by or
> resulting from any of the following, 3.a. through 3.c.  But
> if an excluded cause of loss that is listed in 3.a. through
> 3.c. results in a Covered Cause of Loss, we will pay for
> the loss or damage caused by that Covered Cause of
> Loss." (Emphasis added)

59.    Only B.3.c.(2) is applicable by the express terms of Markel's July 27, 2019

disclaimer letter.  In its <u>CONCLUSION</u>, Markel states in relevant part:

> "Per the previously outlined language, <u>and the</u>
> <u>information provided by the Rimkus engineer, the loss</u>
> <u>sustained to your building was caused by improper design</u>
> <u>and construction</u> we unfortunately are unable to consider
> this claim and the damage you sustained." (Emphasis
> added)

60.    Subsection B.3.c.(2) read in context states as follows:

> "c. Faulty, <u>inadequate or defective:</u>
> (2) <u>Design…construction…</u> ." (Emphasis added)

61.    The Rimkus Report in its CONCLUSIONS at page 2 states in relevant part aping

the language of Subsection B.3.e.(2) as follows:

> "Specifically, the building was <u>not designed and/or</u>
> <u>constructed adequately to support the required minimum</u>
> <u>design snow load on the roof</u> of the structure.  The roof
> and support columns <u>buckled under the weight of the</u>
> <u>snow</u> during the 2018/2019 snow year <u>due to the</u>
> <u>inadequate</u> design and construction noted above."
> (Emphasis added)

62.    Thus, standing alone Saddletree's claim would be an <u>excluded loss</u> pursuant to the

language of Section B.1. and B.3.c.(2).

63.    However, Markel's intentional or gross negligence in its denial of coverage omits

discussion of the language B.3. which reads as follows:

> "But if an <u>excluded cause of loss</u> that is listed in 3.a.
> through 3.c. <u>results in a Covered Cause of Loss, we will</u>
> <u>pay</u> for the loss or damage <u>caused by that covered Cause</u>
> <u>of Loss.</u>" (Emphasis added)

64.    Section G. Definitions subsection 2 of Form CP-10-30-10-12 CAUSES OF LOSS

– SPECIAL FORM relied upon by Markel in its July 27, 2019 letter disclaiming coverage, sets

forth Covered Causes of Loss as follows:

> "2. "Specified causes of loss" means the following…
> WEIGHT OF SNOW… ." (Caps and emphasis added)

65.    Digressing to the Conclusion of the Rimkus Report set forth above, the building

was not designed and/or constructed adequately to support the required minimum design snow

load on the roof of the structure (the excluded cause of loss per B.3.). The roof and support

columns of the building buckled "under the weight of snow" (an express covered cause of loss

per B.G.2.).

66.    Thus, per B.3. an excluded cause of loss resulted in a covered cause of loss for

which Evanston Insurance Company "will pay".

67.    Plaintiff also claimed coverage per section D. Additional Coverage – Collapse.

(See, Exhibit "A")

68.    Section D.1. reads in relevant part as follows:

> "1.    For the purpose of this Additional Coverage,
> collapse, abrupt collapse, means an abrupt falling down
> or caving in of…any part of a building with the result that
> the building…cannot be occupied for its intended
> purpose." (Emphasis added)

69.    Section D.2.d. reads in relevant part as follows:

> "2.    We will pay for direct physical loss or damage to
> Covered Property, caused by abrupt collapse of…any part
> of a building that this insured under this Coverage
> Form…if such collapse is  caused by one or more of the
> following:
>
> ***
>
> d.    Use of defective material (i.e., "construction) or
> methods in construction (i.e., "design")…if the abrupt

13

> collapse occurs after the construction...is complete, but
> only if the collapse is caused in part by:
> ***
> (2) One or more of the "specified causes of loss":
> ***
> (Parenthetical material and emphasis added)

70.     Markel in its denial of coverage omitted the first sentence of Form CP-10-30-10-

12 relating to its provisions (i.e., Sections D.1. and D.2.d., *supra*) which reads as follows:

> "Words and phrases that appear in quotation marks have
> special meaning.  Refer to Section G. Definitions."
> (Emphasis added)

71.     The phrase "Specified Causes of Loss" appearing in quotes in §D.2.d.(2), *supra* is

defined in §2.G.2. as follows:

"2. 'Specified causes of loss' means...WEIGHT OF SNOW..." (Caps added)

72.     Again, the provision of Section D. Additional Coverage – Collapse must be

construed and applied as determined by Markel's expert structural engineer in his July 7, 2019

Report.

73.     That the collapse of a part of the building was abrupt is established by the

findings and conclusion of Markel's expert, Bryan Baggaley, P.E., throughout his report.  For

example, in Conclusion 2 at page 2, "The roof and support columns buckled under the weight of

the snow..." Again, at page 8, "The cause of the fire alarm was determined to be a wire that had

been pinched when an exterior wall trussed column member buckled." (Emphasis added) The

buckling could only have been "abrupt".

74.     The word "buckle" is defined by the Oxford Dictionary and Thesaurus, American

Edition, in relevant part as follows:

> "Collapse, cave in, give way, crumple, knuckle under, fall
> or come apart, bend, warp, distort, twist, bulge."
> (Emphasis added)

14

75.     Section D.1. states for the purpose of this Additional Coverage, Collapse, "abrupt collapse means an abrupt falling down or caving in of a part of a building." (Emphasis added) This meets the exact defined meaning of "buckled", *supra*.

76.     The undersigned emailed Adjuster Harvey Goodman the Albertson expert Opinion that the building collapse was "abrupt". He responded saying he would have it reviewed by his engineer, Bryan Baggaley of Rimkus and provide Mr. Baggaley's report.  He was advised time was of the essence, but even after follow-up, there has been no response.

77.     Section D.1. also requires the abrupt collapse have the "result that the building cannot be occupied for its intended use."

78.     Rimkus found at page 4 of its Report that the intended use of the building was for "multi-purpose public use for weddings, conventions, multi-purpose town events, and as an indoor archery range."

79.     The Rimkus Report at page 8 found and concluded the building cannot be used for its intended purpose as follows:

> "The buckling of these members is considered a structural failure and severely weakens the member capacity to carry loads. Due to these conditions, Rimkus recommends that the structure not be occupied during any months where snow on the roof may occur." (Emphasis added)

80.     All of the elements of Section D. for the Additional Coverage are met, and Evanston Insurance Company must be ordered and directed to pay the $750,000 limit of insurance on the building, attorney's fees, interest at ten percent (10%), costs, and such other consequential and punitive/exemplary damages as determined right and just.

81.     As mentioned, Evanston Insurance Company, Markel Service, Incorporated, Frontier Adjusters and Rimkus Consulting Group, Inc. breached their respective duty to warn Plaintiff of the dangerous condition of the building having actual knowledge thereof and are subject to claims, including compensatory and punitive damages as set forth herein.

B. Claims Against Defendant Rimkus Consulting Group, Inc.

82.     Plaintiff realleges the foregoing allegations, and incorporates them herein by this reference.

83.     The July 17, 2019 Rimkus Report of findings was signed by Bryan L. Baggaley, P.E., and sealed by him under Wyoming Engineering Number 16799. Mr. Baggaley is registered as a professional engineer by the State of Wyoming and subject to it registration laws. His work on this project was performed in Wyoming.

84.     Chapter 29, WSA, establishes a State Board of Registration for Professional Engineers and Land Surveyors. §33-29-115, WSA.

85.     §33-29-119(g) empowers the Board to adopt a nationally recognized code of ethics for the practice of engineering. The Board adopted the NSPE Code of Ethics as the standards, and states:

> "Engineer's must perform under a **standard** of professional behavior that requires adherence to the highest principles of ethical conduct. Engineers, in the fulfillment of their professional duties shall 1. Hold **paramount** the **safety**, health and **welfare of the public**... ." (Emphasis added)

86.     NSPE Code Section 1(a) specifically requires engineers aware of "circumstances that endanger life or property, they shall **notify** their employer or **client and such other authority as may be appropriate**." (Emphasis added)

16

87.     Here, Rimkus contacted the Wyoming State Building Commission to determine

the applicable Building Codes in force at the time of the buildings construction. (page 4) Snow

loads were to be built per the 2012 IBC. Rimkus found the roof structure failed under snow

loads significantly less than Code required design minimum, which it considered a structural

failure, and, having found the intended public uses of the building were for weddings,

conventions, multi-purpose town events and as an indoor archery range, recommended that the

structure "not be occupied during any months where snow on the roof of the structure may

occur." (pages 4 and 8)

88.     These facts were in Rimkus' Report to Frontier Adjusters, and furnished to

Markel which relied on it to deny Plaintiff's claim.

89.     However, Rimkus failed to notify the Wyoming State Building Commission, or

any other public authority of the foregoing **"circumstances that endanger life or property"** as

required by standard 1(a), and otherwise in the Code.

90.     Equally important, Rimkus failed to notify Saddletree, known by it to be the

building owner and insured of the dangerous, unsafe conditions of the building, and failed to

direct Frontier Adjusters or Markel (which states in its July 27, 2019 coverage denial letter that it

"requested Bryan Baggaley of Rimkus Consulting to assist us in the evaluation of the loss") to

warn Saddletree of the dangerous and unsafe building condition, and non-occupation of the

building. Rimkus further failed to follow-up on its July 17, 2019 Report to see that either

Frontier Adjusters or Markel had taken action to notify and warn of the dangerous unsafe

circumstances.

91.     Had Rimkus complied with the standards of the Code and its duties on or about

July of 2019, the public authority would have investigated and likely condemned the building.

17

This, in turn, would have impacted the coverage consideration of Markel and breach of its subrogation rights, and Saddletree's subsequent litigation.

92.     Most importantly, Rimkus was professionally negligent in failing to conclude the structure was irrepairable and recommending its demolition and re-construction to meet code requirements for the public health and safety, as required by the standard of practice adopted by the Wyoming State Board of Registration for Professional Engineers, *supra*. Rimkus observed the buckling of the structural members "is considered a structural failure and severely weakens the member capacity to carry loads (not to mention winds)." In light of those findings, and structural engineering conclusions, Rimkus made the vague and ambiguous (and professionally negligent) recommendation "due to these conditions Rimkus recommends that the structure not be occupied during any months where snow on the roof may occur". (Exhibit "B" p. 8) (Emphasis added)

93.     Rimkus's willful or wanton bad faith, gross negligence, and other tortious breaches of duty as outlined herein give rise to potential punitive/exemplary damages, and action by the State Board of Registration for Professional Engineers.

### C. Claims Against Defendant Frontier Adjusters

94.     Plaintiff realleges the foregoing allegations, and incorporates them herein by this reference.

95.     Rimkus' July 17, 2019 Report of Findings states it was prepared for Frontier Adjusters and its exclusive use, and was not intended for any other use. As discussed above concerning the claims against Markel and Rimkus, the Report recommended the structure not be occupied during any months where snow on the roof of the structure may occur, due to

dangerous, unsafe conditions as set forth with particularity.  In Upton, Wyoming this may include the months of September through April.

96.    Without restating the facts and conclusions set forth above, Frontier Adjusters willful or wanton conduct or gross negligence breached its duties to notify and warn Saddletree, as the insured and claimant, of the dangerous, unsafe conditions of the building to it and the public users.  To have failed to do so was willful or wanton, *per se*!

97.    It was acting as Markel's agent in investigating and adjusting a first-party insured's claim with a duty of good faith and fair dealing.

98.    It further failed to advise Markel to notify and warn Saddletree of these unsafe conditions, or follow-up to insure it had been done.

99.    Frontier Adjusters on information and belief acted in violation of §26-9-135, WSA, subsections (b)(vi) and (d) without an adjuster's license in Wyoming.

100.    Frontier Adjusters is subject to liability for such compensatory and/or punitive damages as may be just and right.

### COUNT I – CLAIMS/CAUSES OF ACTION AGAINST EVANSTON INSURANCE COMPANY AND MARKEL SERVICES, INCORPORATED

1.    Plaintiff realleges the foregoing allegations, and incorporates them herein by this reference.

2.    Defendant Evanston Insurance Company delegated and/or contracted its obligations and duties to adjust and pay claims for coverage under the policy to Defendant Markel Services, Incorporated and to be bound by its decisions.

3.    The act and/or omissions of Markel Services, Incorporated are inputed to Evanston Insurance Company as a matter of law.

19

4.     Markel Services, Incorporated's July 27, 2019 disclaimer of coverage and refusal to pay the benefits due under the policy was a breach of contract, or, alternatively negligent breach of contract, a tortious breach of the implied covenant of good faith and fair dealing, grossly negligent, fraudulent and/or deceitful, intentional and/or willful and wanton, unreasonable and without just cause as alleged herein, to the detriment and damage to Plaintiff.

5.     Defendant Markel Services, Incorporated's receipt of the Rimkus Report prior to its July 27, 2019 disclaimer of coverage and denial of payment knowing of its expert engineer's conclusion of the dangerous condition of the building and risk of harm to the public safety and use of the building for all months when snow might accumulate on the roof of the building and cause its further collapse, and refusal to furnish the Rimkus Report to Plaintiff's attorney's request on September 27, 2019 for the Report stating the Wyoming Department of Insurance advised counsel of his entitlement to the Report and all other materials Markel-Claims relied on to deny the coverage, knowing of its failure to have warned Plaintiff of the dangerous conditions of the structure, was intentional, willful or wanton and/or grossly negligent as a matter of law.

6.     The denial of coverage was a gross misrepresentation, and intentional omission of policy provisions as alleged herein.

7.     Had Markel determined coverage, as it should have, and paid the $750,000 replacement benefit, Evanston would have had the benefit of its subrogation right against Dreams Carports and Buildings, Inc., and the benefit of its expert witness, who had concluded Dreams had negligently designed and constructed the building, to have sought recovery of its payment.

8.     In light of the denial of coverage and payment and refusal to have furnished the Rimkus Report, Plaintiff was forced to hire its own attorney and expert structural engineer and

incur the fees and expenses of pursuing an action against Dreams Carports and Buildings, Inc.
currently totaling $91,916.92 to its detriment and damage.

9.      §26-15-24, WCA, provides in any action or proceedings commenced against any
insurance company on any insurance policy of any kind of insurance, if it is determined that the
company refuses to pay the full amount of a loss covered by the policy and that the refusal is
unreasonable or without cause, any court in which judgment is rendered for a claimant may also
award a reasonable sum as an attorney's fee and interest at ten percent (10%) per year.

10.     Each of the foregoing breaches individually and collectively have foreseeably and
proximately caused, and will continue to cause Plaintiff detriment and damage, and entitlement
to punitive/exemplary damages to the extent as will be shown by evidence at trial.

COUNT II – CLAIMS/CAUSES OF ACTION AGAINST MARKEL CORPORATION

1.      Plaintiff realleges the foregoing allegations, and incorporates them herein by this
reference.

2.      Markel Corporation controlled the financial and operational policies and affairs of
both Evanston Insurance company and Markel Services, Incorporated, sharing office
arrangements, and acted in tortious bad faith and/or was grossly negligent in its supervision and
control of those companies, including but not limited to adjusting and payment policies,
compliance with Wyoming law as alleged herein and as may be proven by evidence at trial.

3.      This Defendant's breaches of duty have foreseeably and proximately caused, and
will continue to cause Plaintiff detriment and damage, and entitlement to such
punitive/exemplary damages to the extent as will be shown by evidence at trial.

COUNT III – CLAIMS/CAUSES OF ACTION AGAINST
RIMKUS CONSULTING GROUP, INC.

1.      Plaintiff realleges the foregoing allegations, and incorporates them herein by this reference.

2.      Rimkus' breach of the professional standard of behavior adopted by the Wyoming State Board of Registration for Professional Engineers requiring registered engineers aware of circumstances that endanger life or property to notify their client and such other Wyoming authority as may be appropriate, together with its other breaches of professional standards, as alleged was professionally negligent, if not grossly negligent or in bad faith under the facts as alleged.

3.      This Defendant's breaches of duty have foreseeably and proximately caused, and will continue to cause Plaintiff detriment and damage, and entitlement to such punitive exemplary damages to the extent as will be shown by evidence at trial.

COUNT IV – CLAIMS/CAUSES OF ACTION AGAINST FRONTIER ADJUSTERS

1.      Plaintiff realleges the foregoing allegations, and incorporates them herein by this reference.

2.      Rimkus' July 17, 2019 Report states it was prepared for the exclusive use of Frontier Adjusters, and not intended for any other use.  The Report concluded the structure was in a dangerous condition jeopardizing the safety of public use, and that it not be occupied in any month in which snow on the roof could cause its collapse.

3.      Frontier Adjusters was acting as the agent for and on behalf of Markel Services, Incorporated in inspecting and adjusting Plaintiff's first-party insured claim with a duty of good faith and fair dealing.

22

4.      Its failure to warn Markel of the damage, and directing Markel to warn Plaintiff, the insured claimant, and to follow through to see that such warning was given, was negligent if not grossly negligent, tortuously in bad faith, and in violation of §26-9-135, WCA, subsections (b)(vi) and (d).

5.      This Defendant's breaches of duty have foreseeably and proximately caused, and will continue to cause Plaintiff detriment and damage, and entitlement to such punitive exemplary damages to the extent as will be shown by evidence at trial.

WHEREFORE, Plaintiff respectfully requests relief from the Court as follows:

A.      For the Court's Orders and Judgment against Defendant Evanston Insurance Company for the $750,000 policy benefit for the replacement cost of the building, for attorney's fees, expert witness fees, interest at 10 percent (10%) per year from and after July 27, 2019, costs and disbursements, and such other compensatory and punitive/exemplary damages evidenced at trial as may be right and just;

B.      For the Court's Orders and Judgment against Defendant Markel Service, Incorporated, alternatively, for the wrongful disclaimer and denial of payment coverage in the amount of $750,000 policy benefit for the replacement cost of the building, expert witness fees, attorney's fees, and interest at ten percent (10%) per year from and after July 27, 2019, costs and disbursements, and such other compensatory and punitive/exemplary damages as may be evidenced at trial, and such other relief as may be right and just;

C.      For the Court's Orders and Judgment against Defendants Rimkus Consulting Group, Inc. and Frontier Adjusters for such compensatory and punitive/exemplary damages as may be evidenced at trial, attorney's fees, costs and disbursements, and such other relief as may be right and just.

Dated this _16_ day of March, 2022.

SCHMIDT LEGAL SERVICES PROF LLC


Ronald G. Schmidt, WSB# 4-4167
1719 W. Main Street
Rapid City, SD 57702
Cellular: (605) 484-4048
Law office: (605) 341-0112
schmidtlaw@rushmore.com
*Attorney for Plaintiff Saddletree Holding, LLC*

24 .

**A STOCK COMPANY**



## EVANSTON INSURANCE COMPANY

Ten Parkway North
Deerfield, IL 60015



EXHIBIT

A

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof,** the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                    **President**

MJIL 1000 08 10                                                          Page 1 of 1

INTERLINE



# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates, or others; and/or
- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or
- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.



# HOW TO REPORT A CLAIM

## How to report a new claim:

- ➢ **Email:** newclaims@markelcorp.com
- ➢ **FAX:** (855) 662-7535
- ➢ **\*Phone:** (800) 362-7535
- ➢ **Mail:** P.O. Box 2009, Glen Allen, VA 23058-2009

Please complete the appropriate ACORD form in detail and include the name and phone number of the contact person at the location of the reported incident. If possible, please attach a copy of the facility incident report. When reporting an auto claim, please identify the unit # on the schedule along with the VIN#. If the loss/claim involves a building or damage to property, please provide the physical address of the property.

**\*Please refer to your specific policy language for new claim reporting requirements. Some policies require you to report all claims in writing only.**

## How to send Supplemental Information / Questions on an existing claim:

- ➢ **Email:** markelclaims@markelcorp.com
- ➢ **FAX:** (855) 662-7535
- ➢ **Phone:** (800) 362-7535
- ➢ **Mail:** P.O. Box 2009, Glen Allen, VA 23058-2009

**If you have questions about a claim, please call 1-800-362-7535.**

**Inquiries may also be faxed to 1-855-662-7535.**

INTERLINE



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**MARKEL®**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**MEIL 1200 10 16**

Page 1 of 1

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**D. Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

 © ISO Properties, Inc., 2001



INTERLINE
POLICY NUMBER: 2AA313427

# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

**FORM NUMBER**        **FORM NAME**

**COMMON**

| | |
|---|---|
| MJIL 1000 08 10 | Policy Jacket (Evanston) |
| MPIL 1007 03 14 | Privacy Notice |
| MPIL 1041 02 12 | How To Report A Claim |
| MPIL 1083 04 15 | U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory Notice To Policyholders |
| MDIL 1000 08 11 | Common Policy Declaration |
| MDIL 1002 01 10 | Schedule of Taxes, Surcharges Or Fees |
| MDIL 1001 08 11 | Forms Schedule |
| IL 00 17 11 98 | Common Policy Conditions |
| IL 00 21 09 08 | Nuclear Energy Liability Exclusion Endorsement |
| IL 09 35 07 02 | Exclusion of Certain Computer-Related Losses |
| IL 09 53 01 15 | Exclusion of Certified Acts of Terrorism |
| MEIL 1200 10 16 | Service Of Suit |
| MEIL 1205 03 18 | Protective Safeguards |
| MEIL 1211 06 10 | Minimum Earned Premium Amendment Endorsement |
| MEIL 1225 10 11 | Change - Civil Union |
| MIL 1214 09 17 | Trade Or Economic Sanctions |

**GENERAL LIABILITY**

| | |
|---|---|
| MDGL 1008 08 11 | Commercial General Liability Coverage Part Declarations |
| CG 00 01 04 13 | Commercial General Liability Coverage Form |
| CG 03 00 01 96 | Deductible Liability Insurance |
| CG 21 07 05 14 | Exclusion – Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability - Limited Bodily Injury Exception Not Included |
| CG 21 36 03 05 | New Entities Exclusion |
| CG 21 39 10 93 | Contractual Liability Limitation |
| CG 21 47 12 07 | Employment - Related Practices Exclusion |
| CG 21 49 09 99 | Total Pollution Exclusion Endorsement |
| CG 21 73 01 15 | Exclusion Of Certified Acts Of Terrorism |
| CG 22 38 07 98 | Exclusion - Fiduciary or Representative Liability of Financial Institutions |
| IL 02 52 09 07 | Wyoming Changes - Cancellation And Nonrenewal |
| MEGL 0001 08 14 | Combination General Endorsement |
| MEGL 0006 05 16 | Amended Conditions - When We Do Not Renew |
| MEGL 0008 01 16 | Exclusion - Continuous Or Progressive Injury Or Damage |
| MEGL 0009 09 18 | Additional Insured |
| MEGL 0023 05 16 | Exclusion - Animals |
| MEGL 0024 05 16 | Exclusion - Assault Or Battery |
| MEGL 0030 05 17 | Limitation Of Coverage To Specified Covered Operations |
| MEGL 0126 05 16 | Amendment Of Liquor Liability Exclusion |

MDIL 1001 08 11



INTERLINE
POLICY NUMBER: 2AA313427

# EVANSTON INSURANCE COMPANY

## SCHEDULE OF TAXES, SURCHARGES OR FEES

| State | Description | Amount |
|-------|-------------|--------|
| | Policy Fee | $ 350.00 |
| | Inspection Fee | $ 200.00 |
| WY | Surplus Lines Tax | $ 250.11 |
| | Service Fee | $ 14.59 |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| TOTAL | | $ 814.70 |

| | |
|---|---|
| MEGL 0211 08 15 | Exclusion - All-Terrain Vehicles, Snowmobiles and Other Off-Road Vehicles |
| MEGL 0217 11 16 | Designated Premises Or Project Limitation |
| MEGL 0265 11 14 | Exclusion - Use And Sale Of Firearms |
| MEGL 0285 02 17 | Exclusion - Real Estate Development Hazards |
| MEGL 0305 05 16 | Exclusion - Swimming or Diving |
| MEGL 1397 07 10 | Exclusion - Aircraft, Auto Or Watercraft |
| MEGL 1615 04 13 | Exclusion - Building Code Violations |
| MEGL 1637 05 17 | Exclusion - Employer's Liability And Bodily Injury To Contractors or Subcontractors |
| MEGL 1650 11 14 | Exclusion - Tree Stands and Tree Steps |

## PROPERTY

| | |
|---|---|
| IL 02 52 09 07 | Wyoming Changes - Cancellation And Nonrenewal |
| MDCP 1000 02 13 | Commercial Property Coverage Part Declarations |
| CP 00 10 10 12 | Building And Personal Property Coverage Form |
| CP 10 10 10 12 | Causes Of Loss - Basic Form |
| CP 00 90 07 88 | Commercial Property Conditions |
| CP 01 40 07 06 | Exclusion of Loss Due To Virus Or Bacteria |
| CP 10 30 10 12 | Causes Of Loss - Special Form |
| CP 10 33 10 12 | Theft Exclusion |
| MECP 1226 09 14 | Changes - Roof Valuation |
| MECP 1310 09 14 | Exclusion - Pollution, Organic Pathogens And Asbestos |
| MECP 1311 09 14 | Exclusion - Sinkhole Collapse |
| MECP 1312 09 14 | Exclusion - Volcanic Action |

INTERLINE
IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 02 52 09 07

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WYOMING CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraph 2. of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Cancellation Of Policies In Effect**

   **a. Less Than 60 Days**

     If this policy has been in effect for less than 60 days, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

     (1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium;

     (2) 30 days before the effective date of cancellation if we cancel for any other reason.

   **b. 60 Days Or More**

     If this policy has been in effect for 60 days or more, or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

     (1) Nonpayment of premium.

     (2) Material misrepresentation of fact which, if known to us, would have caused us not to issue the policy.

     (3) Substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk in writing the policy.

     (4) Substantial breaches of contractual duties, conditions or warranties.

     If we cancel, we will mail or deliver to the first Named Insured and the agent, if any, written notice of cancellation, stating the reason for cancellation, at least:

     (a) 10 days before the effective date of cancellation if cancellation is for the reason stated in **b.(1)** above; or

     (b) 45 days before the effective date of cancellation if cancellation is for the reasons stated in **b.(3)** or **(4)** above.

B. The following is added to the **Cancellation** Common Policy Condition:

   **7.** If we cancel this policy in accordance with Paragraph **2.** of the **Cancellation** Common Policy Condition, any unearned premium will be refunded to the first Named Insured prior to the effective date of cancellation.

 © ISO Properties, Inc., 2006



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – TREE STANDS AND TREE STEPS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to Paragraph **2.** Exclusions under Section **I** – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability and Coverage **B** – Personal And Advertising Injury Liability:

This insurance does not apply to:

**Tree Stands Or Tree Steps**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the use, construction or deconstruction of any tree stand or tree steps.

All other terms and conditions remain unchanged.





# CERTIFICATE OF PROPERTY INSURANCE

**DATE (MM/DD/YYYY)**
6/19/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| MARK WILSON INSURANCE AGENCY <br> 509 Fort St Ste A <br> Buffalo, WY 82834 | PHONE (A/C, No, Ext): (307)684-2460 | FAX (A/C, No): (307)684-8915 |
| | E-MAIL ADDRESS: mwilson3@farmersagent.com | |
| | PRODUCER CUSTOMER ID: | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| **INSURED** | INSURER A: Evanston Insurance | |
| Saddle Tree Holdings LLC <br> 554 Arch Crrek <br> UPTON, WY 82730 | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

LOCATION OF PREMISES / DESCRIPTION OF PROPERTY (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | | COVERED PROPERTY | LIMITS |
|---|---|---|---|---|---|---|---|---|
| | **PROPERTY** | | | | | X | BUILDING | $ 750,000 |
| | CAUSES OF LOSS | DEDUCTIBLES | | | | | PERSONAL PROPERTY | $ |
| | BASIC | BUILDING 750,000 | | | | | BUSINESS INCOME | $ |
| | BROAD | CONTENTS | | | | | EXTRA EXPENSE | $ |
| | SPECIAL | | | | | | RENTAL VALUE | $ |
| A | EARTHQUAKE | | 3AA313427 | 4/22/2019 | 4/22/2020 | | BLANKET BUILDING | $ |
| | WIND | | | | | | BLANKET PERS PROP | $ |
| | FLOOD | | | | | | BLANKET BLDG & PP | $ |
| | | | | | | | | $ |
| | | | | | | | | $ |
| | INLAND MARINE | | TYPE OF POLICY | | | | | $ |
| | CAUSES OF LOSS | | | | | | | $ |
| | NAMED PERILS | | POLICY NUMBER | | | | | $ |
| | | | | | | | | $ |
| | CRIME | | | | | | | $ |
| | TYPE OF POLICY | | | | | | | $ |
| | | | | | | | | $ |
| | BOILER & MACHINERY / EQUIPMENT BREAKDOWN | | | | | | | $ |
| | | | | | | | | $ |
| | | | | | | | | $ |
| | | | | | | | | $ |

SPECIAL CONDITIONS / OTHER COVERAGES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. <br><br> AUTHORIZED REPRESENTATIVE |

© 1995-2015 ACORD CORPORATION. All rights reserved.

ACORD 24 (2016/03)     The ACORD name and logo are registered marks of ACORD



**EVANSTON INSURANCE COMPANY**

State Transaction Code:

## COMMON POLICY DECLARATIONS

**POLICY NUMBER:** 2AA313427          **RENEWAL OF POLICY:** 2AA132775

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)
SADDLE TREE HOLDING LLC
PO BOX 1020
UPTON, WY 82730

Policy Period: From 04/22/2019 to 04/22/2020 at 12:01 A.M. Standard Time at your mailing address shown above.

BUSINESS DESCRIPTION: INDOOR ARCHERY BLDG, DWELLING, GARAGE, BARN, CABINS, VACANT LAND

| FORM OF BUSINESS | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Individual | ☐ Partnership | ☐ Joint Venture | ☐ Trust | ☐ Corporation |
| ☒ Limited Liability Company | ☐ Other Organization: | | | |
| Audit Period: Annual unless otherwise stated: | | FTZ Code: | | |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PART(S), BUT ONLY FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | | |
|---|---|---|
| Commercial Property Coverage Part | $ | 6,149.00 |
| Commercial General Liability Coverage Part | $ | 1,638.00 |
| Commercial Inland Marine Coverage Part | $ | Not Covered |
| Commercial Ocean Marine Coverage Part | $ | Not Covered |
| Commercial Professional Liability Coverage Part | $ | Not Covered |
| Commercial Automobile Liability Coverage Part | $ | Not Covered |
| Liquor Liability Coverage Part | $ | Not Covered |
| Crime Coverage Part | $ | Not Covered |
| Other Coverages:  Terrorism - Certified Acts | $ | Excluded |
| | $ | |
| **Premium Total** | $ | 7,787.00 |
| Other Charges:  Taxes and Fees - See MDIL 1002 | $ | 814.70 |
| | $ | |
| | $ | |
| **GRAND TOTAL** | $ | 8,601.70 |

THIS INSURANCE CONTRACT IS ISSUED PURSUANT TO THE WYOMING INSURANCE LAWS BY AN INSURER NEITHER LICENSED BY NOR UNDER THE JURISDICTION OF THE WYOMING INSURANCE DEPARTMENT. IN THE EVENT OF INSOLVENCY OF THE SURPLUS LINES INSURER, LOSSES WILL NOT BE PAID BY THE WYOMING INSURANCE GUARANTY ASSOCIATION.

**Producer Number, Name and Mailing Address**

| 210510 | |
|---|---|
| | State Surplus Lines License # 205777 |

MDIL 1000 08 11                                                      Page 1 of 2

Big Sky Underwriters, a Division of Hull & Company, LLC
2432 Kemp Street
Missoula, MT 59801

Inspection Ordered: Yes ☐ No ☒
Program Code:

## Endorsements

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:

SEE FORMS SCHEDULE - MDIL 1001

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

Countersigned: 06/18/2019
Date

BY:

**MDIL 1000 08 11**

**Page 2 of 2**



**EVANSTON INSURANCE COMPANY**

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

POLICY NUMBER: 2AA313427                                    ☐ "X" If Supplemental Declarations Is Attached

### DESCRIPTION OF PREMISES

| Prem. No. | Bldg. No. | Location Address | No. of Stories | Year Built | Occupancy | Construction |
|-----------|-----------|------------------|----------------|------------|-----------|--------------|
| 1 | 1 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 0844    **Class Description:** Recreational Facilities, Not Otherwise Classified (Billiard and  Pool Halls, Ice Rinks, Stadiums, Amusement Parks, Fairgrounds  and Baseball Parks)

| 1 | 2 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 0196    **Class Description:** Dwellings Written in Conjunction with Commercial Risks or Written  under a Commercial Package Policy and rated from the Commercial  Lines Manual: 1 Family

| 1 | 3 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 1213    **Class Description:** Miscellaneous Products Storage (other than Wholesale or Retail Storage or Cold Storage)

| 1 | 4 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 1213    **Class Description:** Miscellaneous Products Storage (other than Wholesale or Retail Storage or Cold Storage)

| 1 | 5 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 0196    **Class Description:** Dwellings Written in Conjunction with Commercial Risks or Written  under a Commercial Package Policy and rated from the Commercial  Lines Manual: 1 Family

| 1 | 6 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 0196    **Class Description:** Dwellings Written in Conjunction with Commercial Risks or Written  under a Commercial Package Policy and rated from the Commercial  Lines Manual: 1 Family

| 1 | 7 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 0196    **Class Description:** Dwellings Written in Conjunction with Commercial Risks or Written  under a Commercial Package Policy and rated from the Commercial  Lines Manual: 1 Family

| 1 | 8 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 0196    **Class Description:** Dwellings Written in Conjunction with Commercial Risks or Written  under a Commercial Package Policy and rated from the Commercial  Lines Manual: 1 Family

MDCP 1000 02 13

C. The following is added as an additional Condition and supersedes any other provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured and the agent, if any, at least 45 days before:

   a. The expiration date; or

   b. The anniversary date if this is a continuous policy.

2. Notice of nonrenewal will state the reason for nonrenewal.

3. Any notice of nonrenewal will be mailed or delivered to the first Named Insured's and agent's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2006

IL 02 52 09 07

| 1 | 9 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 0196    **Class Description:** Dwellings Written in Conjunction with Commercial Risks or Written under a Commercial Package Policy and rated from the Commercial Lines Manual: 1 Family

| 1 | 10 | 2739 HWY 116 N, Upton, WY 82730 | 1 | 2016 | | Non-Combustible |

**Class Code:** 0702    **Class Description:** Other Offices and Banks

| 2 | 1 | 1960 ASH STREET, Upton, WY 82730 | 1 | 1949 | | Masonry Non-Combustible |

**Class Code:** 1220    **Class Description:** Household Goods Warehouses

---

**COVERAGES PROVIDED**– Insurance at the described premises applies only for coverages for which a limit of insurance is shown.

| Prem. No. | Bldg. No. | Coverages | Limit of Insurance | Covered Causes Of Loss | Valuation* | Coinsurance** | Rates | Rate Term |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | Building | $750,000 | Special x-theft | RC | 80% | 0.601 | an |
| 1 | 1 | Business Personal Property | $50,000 | Special x-theft | ACV | 80% | 0.601 | an |
| 1 | 2 | Building | $50,000 | Basic | ACV | 80% | 0.427 | an |
| 1 | 3 | Building | $30,000 | Basic | ACV | 80% | 0.471 | an |
| 1 | 4 | Building | $30,000 | Basic | ACV | 80% | 0.471 | an |
| 1 | 5 | Building | $20,000 | Basic | ACV | 80% | 0.427 | an |
| 1 | 6 | Building | $20,000 | Basic | ACV | 80% | 0.427 | an |
| 1 | 7 | Building | $20,000 | Basic | ACV | 80% | 0.427 | an |
| 1 | 8 | Building | $20,000 | Basic | ACV | 80% | 0.427 | an |
| 1 | 9 | Building | $20,000 | Basic | ACV | 80% | 0.427 | an |
| 1 | 10 | Building | $15,000 | Basic | ACV | 80% | 0.336 | an |
| 2 | 1 | Building | $75,000 | Basic | ACV | 80% | 0.492 | an |

*AA-Agreed Amount    *ACV-Actual Cash Value    **If Extra Expense Coverage, Limits On Loss Payment
*RC-Replacement Cost

---

**OPTIONAL COVERAGES** – Applicable only when entries are made in the schedule below.

| Prem. No. | Bldg. No. | Coverages | Limit of Insurance | Covered Causes Of Loss | Valuation* | Coinsurance** | Rates | Rate Term |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

MDCP 1000 02 13

| *AA-Agreed Amount | *ACV-Actual Cash Value | **If Extra Expense Coverage, Limits On Loss Payment |
| --- | --- | --- |
| *RC-Replacement Cost | | |

## MORTGAGEHOLDERS

| Prem. No. | Bldg. No. | Mortgageholder Name And Mailing Address |
| --- | --- | --- |
| 1 | 1 | |
| 1 | 2 | |
| 1 | 3 | |
| 1 | 4 | |
| 1 | 5 | |
| 1 | 6 | |
| 1 | 7 | |
| 1 | 8 | |
| 1 | 9 | |
| 1 | 10 | |
| 2 | 1 | |

## DEDUCTIBLE

| $2,500 | ☒ Per occurrence ☐ Per Location ☐ Per Building ☐ Exception: |
| --- | --- |

**These Declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

**FORMS AND ENDORSEMENTS**: SEE FORMS SCHEDULE – MDIL 1001

**TOTAL PREMIUM FOR THIS COVERAGE PART:**     $6,149

COMMERCIAL PROPERTY
CP 10 30 10 12

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G. Definitions.**

## A. Covered Causes Of Loss

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of or compliance with any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   With respect to coverage for Volcanic Action as set forth in **(5)(a)**, **(5)(b)** and **(5)(c)**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused.

 © Insurance Services Office, Inc., 2011

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

A. The exclusion set forth in Paragraph B. applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

C. With respect to any loss or damage subject to the exclusion in Paragraph B., such exclusion supersedes any exclusion relating to "pollutants".

D. The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

1. Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

2. Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

E. The terms of the exclusion in Paragraph B., or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

© ISO Properties, Inc., 2006

c. **Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

d. **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

e. **Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

f. **War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. **Water**

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings; or

(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

h. **"Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

    © Insurance Services Office, Inc., 2011    CP 10 30 10 12

This exclusion does not apply:

(1) When "fungus", wet or dry rot or bacteria result from fire or lightning; or

(2) To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or

(2) Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

(a) Electrical current, including arcing;

(b) Electrical charge produced or conducted by a magnetic or electromagnetic field;

(c) Pulse of electromagnetic energy; or

(d) Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

b. Delay, loss of use or loss of market.

c. Smoke, vapor or gas from agricultural smudging or industrial operations.

d.(1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

(b) Changes in or extremes of temperature; or

(c) Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

e. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

f. Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

g. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

(1) Applies whether or not an act occurs during your normal hours of operation;

(2) Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

(a) To the extent that coverage is provided under the Additional Coverage, Collapse; or

(b) To collapse caused by one or more of the following:

(i) The "specified causes of loss";

(ii) Breakage of building glass;

(iii) Weight of rain that collects on a roof; or

(iv) Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

 © Insurance Services Office, Inc., 2011 CP 10 30 10 12

4. **Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

a. **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

(1) Any loss caused by or resulting from:

(a) Damage or destruction of "finished stock"; or

(b) The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

(2) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(3) Any increase of loss caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

(4) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

(5) Any other consequential loss.

b. **Leasehold Interest Coverage Form**

(1) Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

(a) Your cancelling the lease;

(b) The suspension, lapse or cancellation of any license; or

(c) Any other consequential loss.

c. **Legal Liability Coverage Form**

(1) The following exclusions do not apply to insurance under this Coverage Form:

(a) Paragraph **B.1.a.** Ordinance Or Law;

(b) Paragraph **B.1.c.** Governmental Action;

(c) Paragraph **B.1.d.** Nuclear Hazard;

(d) Paragraph **B.1.e.** Utility Services; and

(e) Paragraph **B.1.f.** War And Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

(a) **Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

(i) Your assumption of liability was executed prior to the accident; and

(ii) The building is Covered Property under this Coverage Form.

(b) **Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

    a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

    b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

    c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

        (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

        (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

    However, this limitation does not apply to:

    (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

    (2) Business Income Coverage or Extra Expense Coverage.

e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

f. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

g. Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

    (1) Dampness or dryness of atmosphere or of soil supporting the vegetation;

    (2) Changes in or extremes of temperature;

    (3) Disease;

    (4) Frost or hail; or

    (5) Rain, snow, ice or sleet.

2. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

    a. Animals, and then only if they are killed or their destruction is made necessary.

    b. Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

        (1) Glass; or

        (2) Containers of property held for sale.

    c. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

        However, this limitation does not apply:

        (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

        (2) To Business Income Coverage or to Extra Expense Coverage.

© Insurance Services Office, Inc., 2011 CP 10 30 10 12

3. The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

   a. $2,500 for furs, fur garments and garments trimmed with fur.

   b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

   c. $2,500 for patterns, dies, molds and forms.

   d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

   These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

   This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

   a. Results in discharge of any substance from an automatic fire protection system; or

   b. Is directly caused by freezing.

   However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage – Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

   d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (1) A cause of loss listed in **2.a.** or **2.b.**;

      (2) One or more of the "specified causes of loss";

      (3) Breakage of building glass;

      (4) Weight of people or personal property; or

      (5) Weight of rain that collects on a roof.

3. This **Additional Coverage – Collapse** does not apply to:

   a. A building or any part of a building that is in danger of falling down or caving in;

   b. A part of a building that is standing, even if it has separated from another part of the building; or

   c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

   a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers, wharves and docks;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**I.** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

(1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

(2) The property is Covered Property under this Coverage Form.

**5.** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**6.** This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**7.** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

**8.** The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

**E. Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

**1.** The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

**a.** A "specified cause of loss" other than fire or lightning; or

**b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

**2.** We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

**a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

**b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

**c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

**3.** The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

© Insurance Services Office, Inc., 2011

CP 10 30 10 12

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

6. The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

   a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

1. **Property In Transit**

   This Extension applies only to your personal property to which this form applies.

   a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   b. Loss or damage must be caused by or result from one of the following causes of loss:

      (1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism. 

      (2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

      (3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

   c. The most we will pay for loss or damage under this Extension is $5,000.

   This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage**

   If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

3. **Glass**

   a. We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

b. We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

This Coverage Extension **F.3.** does not increase the Limit of Insurance.

## G. Definitions

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

      (1) The cost of filling sinkholes; or

      (2) Sinking or collapse of land into man-made underground cavities.

   b. Falling objects does not include loss or damage to:

      (1) Personal property in the open; or

      (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

c. Water damage means:

   (1) Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

   (2) Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss," such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

© Insurance Services Office, Inc., 2011

CP 10 30 10 12

POLICY NUMBER: 2AA313427

**COMMERCIAL PROPERTY**
**CP 10 33 10 12**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# THEFT EXCLUSION

This endorsement modifies insurance provided under the following:

CAUSES OF LOSS – SPECIAL FORM

### SCHEDULE

| Premises Number | Building Number |
|---|---|
| 1-2 | ALL |
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

With respect to the location(s) indicated in the Schedule, the following is added to the **Exclusions** section:

We will not pay for loss or damage caused by or resulting from theft.

But we will pay for:

1. Loss or damage that occurs due to looting at the time and place of a riot or civil commotion; or

2. Building damage caused by the breaking in or exiting of burglars.

And if theft results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

CP 10 33 10 12                    © Insurance Services Office, Inc., 2011                    Page 1 of 1

POLICY NUMBER: 2AA313427

COMMERCIAL PROPERTY
CP 10 33 10 12

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# THEFT EXCLUSION

This endorsement modifies insurance provided under the following:

CAUSES OF LOSS – SPECIAL FORM

### SCHEDULE

| Premises Number | Building Number |
|---|---|
| 1-2 | ALL |
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

With respect to the location(s) indicated in the Schedule, the following is added to the **Exclusions** section:

We will not pay for loss or damage caused by or resulting from theft.

But we will pay for:

1. Loss or damage that occurs due to looting at the time and place of a riot or civil commotion; or

2. Building damage caused by the breaking in or exiting of burglars.

And if theft results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

© Insurance Services Office, Inc., 2011

COMMERCIAL PROPERTY
CP 00 10 10 12

# BUILDING AND PERSONAL PROPERTY
# COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section H. Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1., and limited in A.2. Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

    (a) Machinery; and

    (b) Equipment;

(4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

    (a) Fire-extinguishing equipment;

    (b) Outdoor furniture;

    (c) Floor coverings; and

    (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(5) If not covered by other insurance:

    (a) Additions under construction, alterations and repairs to the building or structure;

    (b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

(1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

    (a) Made a part of the building or structure you occupy but do not own; and

    (b) You acquired or made at your expense but cannot legally remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

(1) In your care, custody or control; and

(2) Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

    **(1)** The lowest basement floor; or

    **(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, **n.**, does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

**o.** The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

    **(1)** Are licensed for use on public roads; or

    **(2)** Are operated principally away from the described premises.

    This paragraph does not apply to:

        **(a)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

 © Insurance Services Office, Inc., 2011

(b) Vehicles or self-propelled machines, other than autos, you hold for sale;

(c) Rowboats or canoes out of water at the described premises; or

(d) Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers; or

q. The following property while outside of buildings:

(1) Grain, hay, straw or other crops;

(2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.

## 3. Covered Causes Of Loss

See applicable Causes Of Loss form as shown in the Declarations.

## 4. Additional Coverages

### a. Debris Removal

(1) Subject to Paragraphs (2), (3) and (4), we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris Removal does not apply to costs to:

(a) Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

(b) Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

(c) Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

(d) Remove property of others of a type that would not be Covered Property under this Coverage Form;

(e) Remove deposits of mud or earth from the grounds of the described premises;

(f) Extract "pollutants" from land or water; or

(g) Remove, restore or replace polluted land or water.

(3) Subject to the exceptions in Paragraph (4), the following provisions apply:

(a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b) Subject to (a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

(4) We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence ·of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

© Insurance Services Office, Inc., 2011

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |
| ($10,000 is 20% of $50,000.) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example 2**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense: | $ 40,000 |
| Debris Removal Expense Payable | |
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000, capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4)**. Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(b) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e.(6) of this Additional Coverage, is the increased cost of construction at the same premises.

(c) If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e.(6) of this Additional Coverage, is the increased cost of construction at the new premises.

(8) This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

(9) The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in e.(6) of this Additional Coverage, is not subject to such limitation.

f. **Electronic Data**

(1) Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

(2) Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

(3) The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

(a) If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

(b) If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

(c) If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

     © Insurance Services Office, Inc., 2011

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $2,500 (unless a higher limit is shown in the Declarations) for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

(2) Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

(2) If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

(3) If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

(4) Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and, therefore, coverage of such costs is not additional insurance.

**d. Property Off-premises**

(1) You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

(a) Temporarily at a location you do not own, lease or operate;

(b) In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

(c) At any fair, trade show or exhibition.

(2) This Extension does not apply to property:

(a) In or on a vehicle; or

(b) In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

(3) The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion; or

(5) Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

© Insurance Services Office, Inc., 2011    CP 00 10 10 12

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

f. **Non-owned Detached Trailers**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

(a) The trailer is used in your business;

(b) The trailer is in your care, custody or control at the premises described in the Declarations; and

(c) You have a contractual responsibility to pay for loss or damage to the trailer.

(2) We will not pay for any loss or damage that occurs:

(a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

(b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

(4) This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

g. **Business Personal Property Temporarily In Portable Storage Units**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

(2) If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

(3) Coverage under this Extension:

(a) Will end 90 days after the business personal property has been placed in the storage unit;

(b) Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

(4) Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

(5) This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

B. **Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

C. **Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

1. Fire Department Service Charge;

2. Pollutant Clean-up And Removal;

3. Increased Cost Of Construction; and

4. Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

| | | |
|---|---|---|
| Deductible: | $ | 250 |
| Limit of Insurance – Building 1: | $ | 60,000 |
| Limit of Insurance – Building 2: | $ | 80,000 |
| Loss to Building 1: | $ | 60,100 |
| Loss to Building 2: | $ | 90,000 |

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

$ 60,100
–     250
$ 59,850 Loss Payable – Building 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850 + $80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

| | | |
|---|---|---|
| Loss to Building 1: | $ | 70,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss to Building 2: | $ | 90,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss Payable – Building 1: | $ | 60,000 |
| (Limit of Insurance) | | |
| Loss Payable – Building 2: | $ | 80,000 |
| (Limit of Insurance) | | |
| Total amount of loss payable: | $ | 140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny the claim.

3. **Duties In The Event Of Loss Or Damage**

   a. You must see that the following are done in the event of loss or damage to Covered Property:

      (1) Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

h. A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in b., c., d. and e. below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

© Insurance Services Office, Inc., 2011 CP 00 10 10 12

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value, even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety-glazing material if required by law.

e. Tenants' Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in (a) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

## F. Additional Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies:

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

### Example 1 (Underinsurance)

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 100,000 |
| | The Deductible is: | $    250 |
| | The amount of loss is: | $  40,000 |

Step (1): $250,000 x 80% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷ $200,000 = .50

Step (3): $40,000 x .50 = $20,000

Step (4): $20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

### Example 2 (Adequate Insurance)

| When: | The value of the property is: | $ 250,000 |
|---|---|---|
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 200,000 |
| | The Deductible is: | $    250 |
| | The amount of loss is: | $  40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

b. If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example 3**

| When: | The value of the property is: | |
|---|---|---|
| | Building at Location 1: | $ 75,000 |
| | Building at Location 2: | $100,000 |
| | Personal Property at Location 2: | $ 75,000 |
| | | $250,000 |
| | The Coinsurance percentage for it is: | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Locations 1 and 2 is: | $180,000 |
| | The Deductible is: | $ 1,000 |
| | The amount of loss is: | |
| | Building at Location 2: | $ 30,000 |
| | Personal Property at Location 2: | $ 20,000 |
| | | $ 50,000 |

Step (1): $250,000 x 90% = $225,000

(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 ÷ $225,000 = .80

Step (3): $50,000 x .80 = $40,000

Step (4): $40,000 − $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

a. The term mortgageholder includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

(1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item:

**1. Agreed Value**

a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

© Insurance Services Office, Inc., 2011    CP 00 10 10 12

b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

a. The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

If:

| | |
|---|---|
| The applicable Limit of Insurance is: | $ 100,000 |
| The annual percentage increase is: | 8% |
| The number of days since the beginning of the policy year (or last policy change) is: | 146 |
| The amount of increase is: $100,000 x .08 x 146 ÷ 365 = | $  3,200 |

**3. Replacement Cost**

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

(3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(4) "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

(3) If the conditions in d.(1) and d.(2) above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in e.(2) above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

4. **Extension Of Replacement Cost To Personal Property Of Others**

a. If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

b. With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

© Insurance Services Office, Inc., 2011



**Rimkus Consulting Group, Inc.**
**8100 S. Akron Street, Suite 320**
**Centennial, CO 80112**
**Telephone: (720) 488-8710**

# Report of Findings

## Saddle Tree Holdings Property Damage Investigation
## Claim No: P047168

### Rimkus File No: 100004179

### Prepared For:

### Frontier Adjusters
### 3020 Stockade Drive
### Rapid City, SD 57702

### Attention:

### Mr. Andy Schultz



Digitally signed by: Bryan L
Baggaley
Date: 2019.07.17 14:31:06 -07'00'

**Bryan L. Baggaley, P.E.**
**Engineering Number 16799**
**Senior Consultant**



EXHIBIT
B

July 17, 2019

## Section I
## INTRODUCTION

Saddle Tree Holdings (Owner) reported that the roof of their metal building was sagging and pushing exterior walls outward. The Saddle Tree Holdings building (Building) was located at 2739 US Highway 116 in Upton, Wyoming.

Rimkus Consulting Group, Inc. (Rimkus) was retained to determine the cause of damage to the roof structure. This report was reviewed by Thomas J. Cate P.E., National Construction Division Manager.

This report was prepared for the exclusive use of Frontier Adjusters and was not intended for any other purpose. Our report was based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

# Section II
# CONCLUSIONS

1. Sagging of the roof and buckling of the wall columns was caused by improper design and construction of the building. Specifically, the building was not designed and/or constructed adequately to support the required minimum design snow load on the roof of the structure. The building was designed and constructed by Dream Carports and Buildings, Inc.

2. The roof and support columns of the building buckled under the weight of snow during the 2018/2019 snow year due to the inadequate design and construction noted above.

**Site Observations**

During the course of the site inspection on June 6, 2019, the following items and conditions were observed:

- A noticeable sag was observed at the ridgeline of the roof of the building when viewed from the east side. The sag at the ridge was estimated to be about 6 inches (**Photograph 3**).

- In the interior of the building, roof trusses spanning approximately 67 feet and were spaced at 10 feet on-center. There were 17 spaces between trusses resulting in a building that was approximately 170 feet long. The trusses were constructed using 2 1/2-inch heavy gauge tube steel (**Photograph 4**).

- Separations and offsets in the drywall were present in several locations where the trusses intersected the exterior support walls (**Photograph 5**).

- The walls at the truss supports had been opened (by others prior to Rimkus inspection) by cutting away the drywall in four places (**Photograph 6**).

- Where the walls had been opened, the tube steel frame that supported the truss had buckled at the location where the bottom chord of the truss met the tube steel support (**Photograph 7**).

- Measurements using a 4-foot level as a straight edge indicated that the buckled member of the tube steel frame had deformed as much as 2 inches outward toward the exterior from the straight condition (**Photograph 8**).

- The plumbness of the west wall of the building was measured using a 4-foot level and was found to be plumb within 1/8 inch over 4 feet (**Photograph 9**).

- The plumbness of the east wall of the building was measured using a 4-foot level and was found to be 1/2 inch out-of-plumb over 4 feet (**Photograph 10**).

- A red fire alarm wire was present behind the buckled tube at the east wall. The buckled tube created a pinch point for the wire (**Photograph 11**).

- The connection plate at the ridge of the truss had buckled outward 1/8 inch at some locations (**Photograph 12**)

- Some bowing outward of the exterior east wall could be seen when sighting down the length of the wall. The outward bow was estimated to be 1 inch. (**Photograph 13**).

- The roof of the building was inspected and the sag at the ridge was estimated to be 6 inches (**Photograph 14**).

- The sag between the ridge and the eaves were sighted and measured with a tape measure. The sag between the ridge and the eaves was measured to be 3 1/2 inches (**Photographs 15 and 16**).

<u>Snow Data Review</u>

The 2012 IBC required that buildings in Upton, Wyoming, be designed for a 20 pounds per square foot (psf) ground snow load.

Rimkus reviewed ground snow data maintained by the National Operational Hydrologic Remote Sensing Center for the area surrounding the building for the years from 2014 to 2019. The data included the snow-water equivalent of the ground snow during each winter, which could be converted to weight of snow in psf. In particular, station UPTW4, located approximately 1/2 mile south of the building, had history of snow data available as shown in **Table 1**:

**Analysis**

During the inspection, indications of damage to the roof support structure were found in multiple locations. In particular the deflection of the roof and the buckling of the frame members supporting the roof trusses were indications of distress and failure. The tube steel frame members that supported the trusses buckled in an outward direction on both the west and east sides. This indicated that the bottom chord of the roof trusses had thrust outward on both sides of the building causing the supporting tube steel to buckle. The outward thrust of the bottom chord was consistent with expected movement of the truss due to snow and dead loading that exceeded the design loads of the trusses. The permanent deflection of the trusses at the ridge and from the ridge to the eaves was another indication that the loads on the trusses had exceeded the capacity of the truss.

The 2012 IBC required that roof members be designed so that the maximum deflection of the trusses under full design snow load not be more than the truss span divided by 120. For a 67-foot span the maximum allowed deflection with full snow load would be 6.7 inches and the maximum deflection of the truss under dead load without snow would be 2.2 inches. During the inspection it was estimated that the deflection of the roof with no snow was 6 inches or almost 3 times the code allowable.

Although the roof and walls were still intact, the frames in the walls that supported the trusses had localized areas where the steel tube members had buckled up to 2 inches from the vertical condition. The buckling of these members is considered a structural failure and severely weakens the member capacity to carry loads. Due to these conditions Rimkus recommends that the structure not be occupied during any months where snow on the roof of the structure may occur.

As indicated above, the code required that building be designed and constructed to resist a ground snow load of 20 psf. In reviewing the available snow data from surrounding weather stations it was determined that, at the time that the failures of the roof were discovered in February of 2019, the actual ground snow load was 13 psf. Furthermore, the snow data indicated that 13 psf was the maximum ground snow load

that had occurred in Upton, Wyoming, during the life of the building.    As such, the roof structure failed under snow loads that were significantly less than the code required design minimum.  No construction documents or structural calculations were available for review; however, the failures of the roof trusses and support frames at approximately 2/3 of the code minimum snow loads indicated that either the design or the construction of the building was inadequate.  The owner reported that Dream Carports and Buildings had designed and constructed the metal superstructure of the building.  As the failures in the trusses and support frames were consistent with failures due to roof snow loads, and as the code required minimum design snow load had not been exceeded during the lifetime of the structure, it was determined that design and/or construction of the building was inadequate.

Predicated on the above it was concluded that Sagging of the roof and buckling of the wall columns was caused by improper design and construction of the building. Specifically, the building was not designed and/or constructed adequately to support the required minimum design snow load on the roof of the structure.  The building was designed and constructed by Dream Carports and Buildings, Inc.  The roof and support columns of the building buckled under the weight of snow during the 2018/2019 snow year due to the inadequate design and construction noted above.



**MARKEL**

July 27, 2019

**VIA FIRST CLASS & CERTIFIED MAIL — RETURN RECEIPT REQUESTED**
**Receipt No.9214 8901 5421 8700 5503 31**

**OVERNIGHT**

Saddletree Holding LLC
Attention: David Gose
554 Arch Creek Road
Upton, WY 82730



### COVERAGE DISCLAIMER

RE:    Insured:                    Saddletree Holding LLC
       Issuing Company:            Evanston Insurance Company
       Our Claim Number:           P047168
       Policy Number:              2AA132775
       Policy Period:              04/22/2018 to 04/22/2019
       Date of Loss:               01/20/2019

Dear Mr. Gose:

Markel Service, Incorporated, as claims service manager for Evanston Insurance Company (also referred to as "the Company"), acknowledges receipt of the above-captioned claim for loss being presented under the policy referenced above as a result of wind damage. Notice was received on or about 05/09/2018.

For the reasons stated below, Evanston Insurance Company disclaims coverage. No payments under the above policy will be made.

### FACTUAL BACKGROUND

We referred the inspection of the damage to Andy Schultz of Frontier Adjusters to assist us in this matter. We requested Bryan Baggaley of Rimkus Consulting to assist us in the evaluation of the loss you sustained. Mr. Baggaley's inspection determined the cause of loss and the sagging of the roof and the buckling of the wall columns was caused by improper/inadequate design and construction of the building. The building was not designed and/or constructed adequately to support the required minimum design snow load on the roof of the structure. Please refer to the following policy language for an explanation of coverage.

### EVANSTON INSURANCE COMPANY'S POLICY INFORMATION

Evanston Insurance Company insures Saddletree Holding LLC under a Commercial Insurance Policy, designated as policy number 2AA132775. This policy provides coverage subject to other terms, conditions, deductibles and/or co-insurance for Saddletree Holding LLC located at 2739 US Hwy 116, Upton, Wyoming for the period of 04/22/2018 to 04/22/2019.

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markelcorp.com
California License: Markel West Insurance Services #0D95581
www.markelcorp.com

Your policy contains the following Insuring Agreements:

*Please refer to the BUILDING AND PERSONAL PROPERTY COVERAGE FORM CP 00 10 (10 12).*

A.    *Coverage*

    *We will pay for direct physical loss of or damage to Covered Property at the premises Described in the Declarations caused by or resulting from any Covered Cause of Loss.*

1.    *Covered Property*

*Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1. and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.*

b.    *Your Business Personal Property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation of Coverage form:*

(1)    *Furniture and fixtures;*
(2)    *Machinery and equipment;*
(3)    *"Stock";*
(4)    *All other personal property owned by you and used in your business;*
(5)    *Labor, materials or services furnished or arranged by you on personal property of others;*
(6)    *Your use interest as tenant in improvements and betterments.  Improvements and betterments are fixtures, alterations, installations or additions:*
(a)    *Made a part of the building or structure you occupy but do not own; and*
(b)    *You acquired or made at your expense but cannot legally remove;*
(7)    *Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others*

*Also, refer to the CAUSES OF LOSS – SPECIAL FORM CP 10 30 (10 12).*

A.    *COVERED CAUSES OF LOSS*

*When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:*

1.    *Excluded in Section B., Exclusions; or*
2.    *Limited in Section C., Limitations; that follow.*

B.    *EXCLUSIONS*

2.    *We will not pay for loss or damage caused by or resulting from any of the following:*

        d.    (1)    *Wear and tear;*
            (2)    *Rust, corrosion, fungus, decay, deterioration, hidden or latent*

*defect or any quality in property that causes it to damage or destroy itself;*

*3.    We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.*

*a.    Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss or damage.*
*b.    Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.*
*c.    Faulty, inadequate or defective:*
      *(1)    Planning, zoning, development, surveying, siting;*
      *(2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;*
      *(3)    Materials used in repair, construction, renovation or remodeling; or*
      *(4)    Maintenance;*
      *of part or all of any property on or off the described premises.*

*C.    Limitations*

*The following limitations apply to all policy forms and endorsements, unless otherwise stated.*

*1.    We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.*

*c.    The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:*

    *(1)    The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or*
    *(2)    The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.*

## CONCLUSION

Based on all of the foregoing, we must disclaim coverage to Saddletree Holding LLC and no payment will be made under the policy. Per the previously outlined policy language, and the information provided by the Rimkus engineer, the loss sustained to your building was caused by improper design and construction we unfortunately are unable to consider this claim and the damage that you sustained.

Please be advised that our position is based upon the facts and information available to Evanston Insurance Company at this time and is subject to the availability and review of additional information. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver or estoppel. Furthermore, this letter does not constitute a waiver of any policy provisions

Page 4

or defenses available to the Company.  All rights are expressly reserved.

If any of the factual information relied upon by us in this letter is materially incorrect, or if you possess any additional information which you believe impacts the coverage position taken herein, please immediately contact the undersigned at (800) 362-7535 ext. 345616.


Please reference our Claim Number P047168 on all future correspondence.

Very truly yours,

MARKEL SERVICE, INCORPORATED

*Harvey Goodman, AIC*

Claims Examiner

cc:

Big Sky Underwriters
P.O. Box 3567
Missoula, MT 59806



**MARKEL**

December 17, 2021

**VIA EMAIL, FIRST CLASS & CERTIFIED MAIL — RETURN RECEIPT REQUESTED**

Mr. Ronald G Schmidt, Esq.
Schmidt Legal Services, Prof. LLC
1719 West Main Street
Rapid City, South Dakota 57702

E-mail: priscillams@q.com



EXHIBIT

## COVERAGE DISCLAIMER CONFIRMATION

RE:  Insured:                Saddle Tree Holdings, LLC
     Issuing Company:        Evanston Insurance Company
     Our Claim Number:       P047168
     Policy Number:          2AA132775
     Policy Period:          04/22/2018 to 04/22/2019
     Date of Loss:           01/20/2019 (As Reported)

Dear Mr. Schmidt:

Markel Service, Incorporated, as claim service manager for Evanston Insurance Company ("Evanston"), previously acknowledged receipt of the above-captioned claim for loss being presented under the policy referenced above as a result of claimed wind damage. Notice was received on or about May 9, 2019 with a reported date of loss of January 20, 2019.

Evanston denied this claim on July 27, 2019. On October 25, 2021, you requested that Evanston reconsider its denial and pay the policy limits and attorney fees, costs, interest and other damages. At your request, Evanston reconsidered and reviewed its coverage position. As discussed below, Evanston maintains its coverage position, and this letter serves as Evanston's confirmation of its denial. Accordingly, no payments under the above policy will be made.

## FACTUAL BACKGROUND

Per the notice of loss dated May 7, 2019, the claimed date of loss is January 20, 2019, and the description of the loss was reported as "wind damage roof on both sides. Structure damage pushing on sheet rock. Alarm went off."

On May 15, 2019, our independent adjuster inspected the building and found no signs of wind or hail damage as reported. Prior to the independent adjuster's inspection, sections of sheetrock had been removed around several of the vertical and angle supports for the roof. The independent adjuster observed that it appeared that the 45 degree supports were pushing down and out on the vertical metal supports causing them to bend and buckle. He also observed that sheetrock was separating and cracking near the supports. The independent adjuster further noted that it appeared that the center of the ridgeline of the roof was sagging or dipping and the slopes had a waviness appearance along the purlins. Further, as the

**Markel – Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #OD95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

independent adjuster walked along the slopes, there was a sense of the roof bouncing and moving. During his inspection, one of the Insured's representatives pointed out how the long walls of the building appeared to be bulging in and out. One of the Insured's other representatives at the inspection stated that they recently noticed the walls appeared to be buckling. The Insured's representatives denied any significant weather events -- no extreme winds, snow or ice in that year. The independent adjuster likewise found no significant weather events in the area.

We referred a follow-up inspection to Rimkus Consulting Group Inc., who inspected the building on June 6, 2019. During that inspection, the Insured told the Rimkus engineer that a fire alarm had sounded in mid-February 2019 without a fire and that it was determined that the wire had been pinched when an exterior wall trussed column member buckled. Four additional columns were checked and found to have buckled as well. The Insured also informed the Rimkus engineer that there had been 30 inches of ground snow during the winter of 2018/2019 and that the snow slid off the west side of the building but accumulated on the east side during that winter. According to the Insured, when the snow melted off the roof that winter, there was a definitive sag noticed in the roof.

The Rimkus engineer also observed a noticeable sag, estimated at about 6 inches, in the ridgeline of the roof. He also observed that tube steel frames that supported the truss had buckled as much as two inches outward where the bottom chord of the truss met the tube steel support. He further observed the east wall was out of plum, the connection plate at the ridge of the truss had buckled outward 1/8 inch, and there was bowing of the outward exterior wall.

The building was supposed to have been designed to a minimum of 20 pounds per square foot ground snow load. At the time the buckled column was discovered in mid-February 2019, the ground snow load was 13 pounds per square foot.

The engineer opined:

> (1) The sagging of the roof and buckling of the wall columns was caused by improper design and construction of the building. Specifically, the building was not designed and/or constructed adequately to support the required minimum design snow load on the roof of the structure; and

> (2) The roof and support columns of the building buckled under the weight of snow during the 2018/2019 snow year due to the inadequate design and construction noted above.

The Rimkus engineer concluded that the building was not constructed in accordance with the 2012 International Building Code as required by Wyoming. Although the Rimkus engineer acknowledged that the columns of the building had buckled under the weight of snow, those snow loads were significantly less than the code required minimum. Accordingly, because of these circumstances, the Rimkus engineer opined that the damage was due to the inadequate design and construction of the building and recommended that "the structure not be occupied during any months where snow on the roof of the structure may occur."

## EVANSTON INSURANCE COMPANY'S POLICY INFORMATION

In relevant part in response to your request to reconsider, the policy provides as follows:

### *CAUSES OF LOSS -- SPECIAL FORM*

**A.**    *Covered Causes of Loss*

> *When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.*

**B.**    *Exclusions*

Page 3

3.      We will not pay for loss or damage caused by or resulting from any of the following,
        3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c.
        results in a Covered Cause of Loss, we will pay for the loss or damage caused by
        that Covered Cause of Loss.

        c.      Faulty, inadequate or defective:

                (1)     Planning, zoning, development, surveying, siting;
                (2)     Design,    specifications,    workmanship,    repair,    construction,
                        renovation, remodeling, grading, compaction;
                (3)     Materials used in repair, construction, renovation or remodeling;
                (4)     Maintenance;

                of part or all of any property on or off the described premises.

## D.      Additional Coverage – Collapse

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt
collapse as described and limited in D.1. through D.7.

1.      For the purpose of this Additional Coverage, Collapse, abrupt collapse means an
        abrupt falling down or caving in of a building or any part of a building with the
        result that the building or part of the building cannot be occupied for its intended
        purpose.

2.      We will pay for direct physical loss or damage to Covered Property, caused by
        abrupt collapse of a building or any part of a building that is insured under this
        Coverage Form or that contains Covered Property insured under this Coverage
        Form, if such collapse is caused by one or more of the following:

        d.      Use of defective material or methods in construction, remodeling or
                renovation if the abrupt collapse occurs after the construction, remodeling
                or renovation is complete, but only if the collapse is caused in part by:

                (2)     One or more of the "specified causes of loss";

3.      This Additional Coverage – Collapse does not apply to:

        a.      A building or any part of a building that is in danger of falling down or
                caving in;
        b.      A part of a building that is standing, even if it has separated from another
                part of the building; or
        c.      A building that is standing or any part of a building that is standing, even if
                it shows evidence of cracking, bulging, sagging, bending, leaning, settling,
                shrinkage or expansion.

## CONCLUSION

**No "Resulting Loss"**

Page 4

In its disclaimer letter dated July 27, 2019, Evanston, in relevant part, denied coverage based on its application of the faulty, inadequate or defective design or construction exclusion ("faulty design/construction exclusion") in section **B.3.c.(1) – (4)**. You acknowledge the application of that exclusion and do not dispute its application. Instead, relying solely on the Rimkus report, which you likewise do not dispute, you argue that the "resulting loss" exception to the faulty design/construction exclusion applies to provide coverage. Specifically, you argue that the faulty, inadequate or defective design or construction "'resulted' in the weight of the snow causing the building to collapse ...."

The "resulting loss" exception requires that the excluded cause of loss in **B.3.c.** "result[] in a Covered Cause of Loss," and you are relying on the additional coverage for collapse as that covered cause of loss. Evanston disagrees that the "resulting loss" exception applies.

There is no coverage under the "resulting loss" exception to the faulty design/construction exclusion because the excluded cause of loss, *i.e.* faulty, inadequate or defective design or construction, did not result in a covered cause of loss that then caused loss or damage, as required under the policy. In this claim, there is no "resulting loss" because the claimed resulting loss or damage, *i.e.* sagging of the roof and buckling of the wall supports, is the same loss or damage as the excluded loss or damage. In other words, there is no resulting loss or damage separate and distinct from the excluded loss or damage. The sagging roof and the buckling wall supports are the loss or damage caused by or resulting from the excluded faulty, inadequate or defective design or construction. That damage is the natural and expected result of the excluded faulty, inadequate or defective design or construction.

You contend that the same sagging roof and buckling wall supports are the loss or damage caused by the resulting collapse. Under your theory, there is no separate and distinct loss which "resulted" from the excluded loss. In conclusion, the collapse did not cause damage beyond that damage normally expected as a result of the faulty, inadequate or defective design or construction.

Accordingly, the "resulting loss" exception does not apply.

### No Covered Cause of Loss for "Resulting Loss" Exception

Even if Evanston assumes for the sake of argument only that there was a separate and distinct "resulting loss", there is no coverage under the "resulting loss" exception. Per the policy, the "resulting loss" must be a covered cause of loss. The additional coverage for collapse upon which you rely, however, does not apply.

Per section **D.**, the additional coverage for collapse only applies when there is "an abrupt collapse", which is defined in section **D.1.** as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." In this claim, there has not been "an abrupt collapse" because there has not been "an abrupt falling down or caving in of a building or any part of a building." You have not provided any affirmative expert opinion or documentary evidence that shows that any part of the building abruptly fell or caved in, and the Rimkus report upon which you rely does not show that either. Thus, there is no showing of a single moment or a sudden occurrence when the roof sagged and the wall supports buckled.

Also, neither the Insured nor you have identified when the claimed collapse allegedly occurred, and the conflicting dates provided do not support a finding of "an abrupt collapse". For example, in the notice of loss, the Insured initially reported the date of loss as January 20, 2019 and the cause as wind damage. No wind damage, however, was later found during the independent adjuster's inspection. The suggestion of a collapse was not raised until your request to reconsider the denial. Additionally, the notice stated that the structure was pushing on the sheetrock and an alarm went off. The Insured, however, later stated that the alarm sounded in mid-February – not the reported date of loss. It appears that at that time the Insured investigated the column that had buckled and pinched the alarm wire, it also investigated four others columns and found they had buckled too. Even later, when the snow melted off the roof, the Insured noticed the sag in the roof. Further, during the inspection, the Insured's representatives denied any significant weather events during the 2018/2019 winter, and the independent adjuster could not find any significant weather events either. The Insured did not provide notice of the claimed loss until May 7, 2019.

Page 5

Moreover, it should be noted that the Rimkus did not characterize the roof sagging and the wall supports buckling as a collapse. He also did not identify any particular event when the sagging and buckling occurred and did not conclude that the claimed damage occurred suddenly or abruptly.

You contend that the collapse was "abrupt" because the fire alarm sounded in mid-February 2019 when the wire had been pinched by a wall support that buckled enough to pinch the wire. As stated, Rimkus did not conclude that this was the sudden event when the roof sagged and the wall supports buckled. There is nothing about the pinched wire that suggests that the sagging and buckling occurred suddenly or that the structural defects did not worsen or gradually deteriorate over time.

Furthermore, as you know, the additional coverage for collapse does not apply to "a building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion" per **D.3.c.**. It is undisputed that the building remained standing after January 20, 2019, the reported date of loss, and through at least Rimkus' inspection on June 6, 2019. Accordingly, the additional coverage for collapse does not apply to the claimed loss.

Additionally, the additional coverage for collapse also does not apply to a "building or any part of a building that is in danger of falling down or caving in" per **D.3.a.**. Rimkus did not conclude that any part of the building had collapsed or that any part of the building was in danger of falling down or caving in. Rather, it found in part: (1) damage to the roof support structure in multiple places; (2) deflection of the roof and buckling of the frame members supporting the roof trusses; (3) distress and failure; (4) buckled wall supports which was considered a structural failure and severely weakened the member capacity to carry loads; (5) movement of the truss due to snow and dead loading that exceeded the design loads of the trusses; (6) the roof structure failed under snow loads significantly less than the code required design minimum. As a result, Rimkus recommended that "the structure not be occupied during any months where snow on the roof of the structure may occur." Rimkus did not conclude that any part of the building was in danger of falling down or caving in, that the building could not be occupied, or that building could not be used for its intended purposes during non-snow months. Nonetheless, **D.3.a.** further demonstrates that even if a part of this building, which remained standing for at least five months, was in danger of falling down or caving in, that would still not qualify as an "abrupt collapse" under this additional coverage.

Finally, the definition of "abrupt collapse" also requires that as a result of an abrupt falling down or caving in of any part of a building at least part of the building "cannot be occupied for its intended purpose." As stated above, Rimkus did not conclude that any part of the building could not be occupied for its intended purposes during non-snow months. You recognize in your letter that the building remained standing and that it could be occupied for its intended purpose *for at least the non-snow months*. As a result, this requirement in the definition of "abrupt collapse" is not satisfied.

Therefore, the additional coverage for collapse does not apply.

In conclusion, the claimed loss is excluded by the faulty, inadequate or defective design or construction exclusion in **B.3.c.**. The "resulting loss" exception does not apply, and the additional coverage for collapse does not apply. As a result, there is no coverage, and Evanston stands on its denial.

Please be advised that our position is based upon the facts and information available to Evanston Insurance Company at this time and is subject to the availability and review of additional information. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver or estoppel. Furthermore, this letter does not constitute a waiver of any policy provisions or defenses available to the Company. All rights are expressly reserved.

If any of the factual information relied upon by us in this letter is materially incorrect, or if you possess any additional information which you believe impacts the coverage position taken herein, please immediately contact the undersigned at (800) 362-7535 ext. 345616.

Please reference our Claim Number P047168 on all future correspondence.

Very truly yours,

Page 6

MARKEL SERVICE, INCORPORATED

*Harvey Goodman, AIC*

Claims Examiner


cc:

Saddle Tree Holdings, LLC
Attention: Mr. David Gose
554 Arch Creek Road
Upton, Wyoming 82730

Big Sky Underwriters
P.O. Box 3567
Missoula, MT. 59806

**RONALD G. SCHMIDT**
Schmidt Legal Services Prof LLC
1719 W. Main Street
Rapid City, SD 7702
(605) 484-4084



January 4, 2022

*Via E-Mail and Certified U.S. Mail*
*Return Receipt Requested*

Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
ATTN: Harvey Goodman, AIC
   (via email - harvey.goodman@markel.com)

   Re:   Claim No. P047168 – Rebuttal to December 17, 2021 Re-denial

Dear Mr. Goodman:

   1.   This acknowledges receipt of your December 17, 2021 re-denial of my client
Saddletree's October 25, 2021 claims (1) for the resulting loss exception; (2) for the "D. Additional
Coverage – Collapse"; and, (3) for the willful and wanton failure to warn Saddletree, the insured, of
the unsafe and dangerous condition of the building and the recommendation of Rimkus "that the
structure not be occupied during the months where snow on the roof of the structure may occur."
This obviously endangered the public users, and Saddletree's employees and other persons' life,
safety and well-being.

   2.   Your December 17, 2021 response was silent concerning the third claim for failure
to warn which, in my opinion, constitutes bad faith. I have heard nothing from either Rimkus or
Frontier Adjusters on this subject.

   3.   The insured does not need to prevail on its contract claims to prevail on its claim for
breach of good faith and fair dealing. *State Farm Mutual Automobile Insurance Company v.
Shrader*, 882 P.2d 813, 828 (Wyo. 1994).

> "The conclusion drawn from both Darlow and Hatch is that while an insured may state causes of action for breach of contract and breach of the duty of good faith and fair dealing, the insured does not need to prevail on the contract claim to prevail on the claim for breach of the duty of good and fair dealing (citations omitted)." (Id. 828)

Further,

> "A cause of action for "first party" bad faith will lie when an insurer in bad faith refuses to pay its insured's direct claim for policy benefits. *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855 (Wyo. 1990). Bad faith in this context would occur if an insurer knowingly or recklessly denied a first party claim for insurance benefits without having a reasonable basis for doing so. Id. at 860. *Herrig v. Herrig*, 844 P.2d 487, 490-91 (Wyo. 1992)"

4.      Wyoming has recognized that a breach of the implied covenant of good faith and fair dealing which rises to a level of an independent tort is actionable for compensatory and punitive damages. *McCullough, supra* at 860-61. A recovery in tort for the breach of the duty of good faith and fair dealing "is premised upon the existence of a special relationship created by the unequal bargaining power that an insurer has over an insured." Id. at 858.

5.      In *McCullough*, the Wyoming Supreme Court adopted an objective standard of care as a measure of the required conduct of insurers, stating as follows:

> "Under this standard, 'where a claim was not fairly debatable, refusal to pay would be bad faith and, under appropriate facts, could give rise to an action for tortious refusal to pay a claim.' " Id. at 374. A claim is "fairly debatable" when a reasonable insurer would have denied or delayed payments of the claim for benefits under the facts and circumstances. Id. at 860. Therefore, to establish a breach of the duty of good faith and fair dealing, the insured must show: (1) the absence of any reasonable basis for denying the claim for benefits; and (2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim for benefits. *McCullough* at 860 (quoting from *Anderson*, 271 N.W.2d at 376); and *Darlow v. Farmers Ins. Exchange*, 822 P.2d. 820, 824 (Wyo. 1991)"

2

6.    Thus, if Markel persists (under the following facts and discussion) in denying Saddletree's claims, it will be for a jury to decide whether the claims were "fairly debatable" and if there was any "reasonable basis" for their denial.

7.    Having written the denial letters, it will be your duty as a witness to justify the denials.

8.    It is a cardinal principle of insurance law that a policy or contract of insurance is to be construed liberally in favor of the insured, and strictly as against the insurer. (This is a jury instruction.) *Bruegger v. National Old Line Ins. Co.,* 387 F. Supp. 1177 (USDC, Wyo., 1975). Wyoming law determines the rights and liabilities of the parties in an insurance action. (See, Evanston policy relating to Wyoming law.)

9.    In your December 17, 2021 maintenance of Evanston's previous denial position, you state your position is based on the facts and information available to Evanston at this time, and is subject to the availability and review of additional information. Further, you state if any of the factual information relied upon by you in your December 17, 2021 letter is "materially incorrect", or if Saddletree possesses any information which is believed impacts your coverage position, to contact you.

10.    Saddletree for the following reasons asserts your factual and policy interpretations are "materially incorrect", and is providing additional information for your review and revision of your position.

## RESPONSE TO FACTUAL BACKGROUND

11.    You state the Notice of Loss dated May 7, 2019 indicates the date of loss as **January** 20, 2019 due to **wind** damage and the **"ALARM WENT OFF"**. (Emphasis added)

12.    It is further stated that the insured (David Gose) told the Rimkus engineer during the June 6, 2019 inspection "that a **FIRE ALARM** had sounded in **mid-February** 2019 without a fire and that it was determined that the wire had been pinched when an exterior wall trussed column

3

member had **buckled**. Four additional columns were checked and found to have **buckled** as well."
(Emphasis added)

13.     You make much ado about these alleged conflicting dates in the next-to-last
paragraph on page 4 of your letter, and state the neither the insured nor I "have identified **when** the
claimed collapse allegedly occurred, and the conflicting dates provided do not support a **finding** of
'an abrupt collapse'." (Emphasis added)

14.     Exactly when the building buckled/collapsed is irrelevant.  The relevant fact that the
walls buckled/collapsed is acknowledged by Mr. Gose, your independent adjuster (Andy Schultz of
Frontier Adjusters), and your engineer (Bryan Baggeley of Rimkus Consulting) who all observed
and concluded (as you admit in your December 17, 2021 denial letter) the walls had "buckled" (as
defined, *intra*, as "**collapse, cave in**, give way, crumple...bend, warp, distort, twist, bulge."

15.     As background, Mr. Gose did not open sections of sheetrock and discover the
"buckling/collapse until **May 2**, 2019. He filed this claim on **May 9**, 2019. He is not an engineer,
and assumed the collapse was caused by the "wind". Your expert engineer, Mr. Baggeley,
ultimately determined and opined the roof and support columns of the building "**buckled under the
weight of the snow**..." (Emphasis added)

16.     Thus, the roof and support columns would not have buckled/collapsed but for the
"weight of the snow" (covered by the express policy provisions).

17.     Digressing, you state at page 2 of your December 17, 2021 quoting Mr. Baggeley,
"The roof and support columns of the building **buckled under the weight of snow** during the
2018/2019 snow year..." (Emphasis added)

18.     You state at page 1 of the letter that Mr. Schultz observed during his May 15, 2019
inspection that "sections of sheetrock had been removed around several of the vertical and angle
supports for the roof", and "it appeared that the 45 degree supports were pushing down and out on
the vertical metal supports causing them to **buckle**." (Emphasis added)

4

19.    Further, you state that one of the insured's representatives (Mr. Gose) during the inspection "stated that they recently noticed the walls appeared to be **buckling**." (Emphasis added)

20.    Everyone observed and opined the walls had **buckled/collapsed**. Your expert, Mr. Baggeley, repeatedly and consistently opines it was **caused** by the "weight of the snow". That would by any criteria have had to have been abrupt and sudden. It's simply common sense!

21.    Importantly, Mr. Gose, as mentioned, did not open the sheetrock until **May 2**, 2019 when he first discovered the buckling/collapse and pinched wire. Mr. Baggeley reported the snow accumulated on the roof of the building during the winter of 2018/2019. While it may be difficult to determine the date of the collapse, the undisputed fact as opined by Mr. Baggeley is that there was an abrupt collapse caused by "the weight of the snow"! As mentioned, the precise date of the collapse is irrelevant, and a red herring!

22.    On May 7, 2019, Markel's "independent adjuster" (Frontier Adjusters) inspected the building "and found no signs of wind or hail damage". This supports the Rimkus findings and opinion of causation due to the weight of the snow.

23.    Markel alleges numerous observations and findings attributed to its "independent adjuster" (Frontier Adjusters) without reference to its Report. Saddletree hereby demands the good faith production of all communications, including but not limited to reports by and between Markel and Frontier Adjusters related to this matter.

24.    The remainder of the **"FACTUAL BACKGROUND"** on page 2 of the letter pertains to Rimkus, its expert engineer. The references are cherry-picked from Rimkus's July 17, 2019 **Report of Findings** which speaks for itself. Again, Saddletree hereby demands the good faith production of all communications by and between Markel and Rimkus Consulting Group, Inc.

25.    At page 2 of your letter, you quote from Rimkus's Report as follows:

"The engineer opined:

(1) The sagging of the roof and **buckling of the wall columns** was caused by improper design and construction of the building.

5

Specifically, the building **was not designed and/or constructed adequately to support the required minimum design snow load on the roof** of the structure; and

(2) The roof and support columns of the building **buckled under the weight of snow** during the 2018-2019 snow years due to the inadequate design and construction noted above." (Emphasis added)

26.     In the concluding paragraph on page 2 of the Factual Background section, Markel

states, in part, as follows:

"Although the Rimkus engineer **acknowledged that the columns of the building had buckled  under the weight of snow**, those snow loads were significantly less than the code required minimum. Accordingly, because of these circumstances, the Rimkus engineer opined that the damage was due to the inadequate design and construction of the building and recommended that "**the structure not be occupied during any months where snow on the roof of the structure may occur**." (Emphasis added)

27.     As noted, Mr. Gose advised the Rimkus engineer on June 6 during the inspection

that after the fire alarm sounded "it was determined (on May 2) that the wire had been pinched

when an exterior wall trussed column member **BUCKLED**.  Four additional columns were checked

and found to have **BUCKLED** as well."

28.     As further noted, "the Rimkus engineer acknowledged that the columns of the

building had **BUCKLED UNDER THE WEIGHT OF SNOW**." (Caps and emphasis added)  It

must be further noted **the fact that the structure buckled under the weight of the snow and set**

**off the fire alarm** is consistent throughout the Rimkus Report.  The buckling was an abrupt

collapse!

29.     The Oxford Dictionary and Thesaurus, American Edition, defines "**buckle**" in

relevant part as:

"**Collapse, cave in**, give way, crumple, knuckle under, fall or come apart, bend, warp, distort, twist, bulge." (Emphasis added)

6

30.     The fact that the building was improperly designed and/or constructed is a passive fact.  For example, if the building were located in a dry, warm climate with no snow, such as parts of Arizona or California, it in all probability would have never collapsed.  The weight of the snow was the active factor that caused the abrupt collapse and caused the covered damage.

## EVANSTON INS. CO.'S POLICY INFORMATION

31.     In reviewing the policy provisions you set forth at page 2-3 of your letter, you neglected to include the first sentence of the SPECIAL FORM, and Section G referenced therein.  You also neglected to reference or discuss Saddletree's claim and the relevance of these provisions in your **Conclusion** section of your letter.  This claim relates to the "resulting loss" coverage of Section B3 and Section D2.a.(2) is discussed at length in Saddletree's October 25, 2021 **Notice of Claims**, incorporated herein by this reference.

32.     The first sentence of the SPECIAL FORM reads as follows:

> "Words and phrases that appear in quotation marks have special meaning.  Refer to Section G.  Definitions"

33.     Section B.3. reads, in part, as follows:

> "But if an excluded cause of loss that is listed in 3.a through 3.c. **results in a Covered Cause of Loss, we will pay** for the loss and damage caused by the Covered Cause of Loss.
>
> ***
>
> C. Faulty, inadequate, or defective:
>
> ***
>
>     (2)     Design...construction..."

34.     Rimkus, echoing the language of the foregoing Section, found and concluded "the building was not designed and/or constructed adequately to support the **required minimum design snow load**..."  Further, "The roof and columns **buckled under the weight of the snow**...due to the inadequate design and construction noted above."

35.     Section G.2 defines Covered Causes of Loss and states, in part, as follows:

> "Specified causes of loss means the following…**WEIGHT OF SNOW**…" (Caps and emphasis added)

36.    As noted above, you admitted "the Rimkus engineer acknowledged that the columns of the building had **buckled under the weight of the snow**…" (Emphasis added)

37.    Section B.3 explicitly states if an excluded cause of loss (e.g., the defective design and/or construction) **results in a covered cause of loss** (e.g., the weight of snow) Evanston Insurance **will pay** for the loss or damage "caused by the Covered Cause of Loss". I rest my case!

38.    Saddletree's second claim arises under Section D.  **Additional Coverage – Collapse.**

39.    Section D.1 reads, in part, as follows:

> "D.1. For the purpose of this **Additional Coverage,** Collapse, abrupt collapse means an **abrupt falling down or caving in** of … any part of a building **with the result that the building…cannot be occupied for its intended purpose.**" (Emphasis added)(See, definition of "buckle", ¶ 30, *supra* "collapse, cave in…")

40.    Section D.2.d.(2) requires coverage payment under the undisputed facts as follow, in part reading:

> "D.2. We **will pay** for direct physical loss or damage to Covered Property (the building), caused by **abrupt** collapse ("the Rimkus engineer acknowledged that the columns of the building had **buckled** (i.e., "**collapsed**", as defined, *supra*, and also meaning," "**cave in**, give way, crumple, fall or come apart, bend, warp, distort, twist, bulge." (emphasis added) **under the weight of the snow**…" (Emphasis added)
>
> d.  Use of defective material or methods (e.g., design) in construction…if the **abrupt** collapse occurs **after** construction…but only if the collapse is **caused in part** by:
>
> (2)  One or more of  the "**specified causes of loss**";" (Emphasis added)

41.    As stated, the **CAUSES OF LOSS – SPECIAL FORM** emphatically states:

> "Words and phrases that appear **in quotation marks** have **special** meaning.   Refer to Section G. Definitions." (Emphasis added)

42.   The term **"Specified Causes of Loss"** appearing in Section D.2.d.(2) is in quotes.

43.   Section G.2 defines the quoted words "specified cause of loss" having special meaning, in part, as follows:

> "Specified causes of loss" means the following:...**weight of snow**..." (Emphasis added)

44.   As mentioned, you state in your letter, in part, as follows:

> ...the Rimkus engineer acknowledged that the columns of the building had **buckled** (e.g., collapsed) **under the weight of the snow**..." (Emphasis added)

45.   As discussed, the "weight of the snow" was the active cause of the abrupt collapse. The building although defectively designed and/or constructed, would not have collapsed but for the snow.   Section D.2.d.(2) mandates payment of the claim since the physical loss or damage to the building was caused in part by the "weight of the snow" as a "specified cause of loss"!

46.   Mr. Gose, and others, will testify there was never any indication of damage or problems with the building prior to this incident.   The immediate investigation after the claim disclosed as stated at page 2 of your letter:

> "We referred a follow-up inspection to Rimkus Consulting Group, Inc., who inspected the building on June 6, 2019. During that inspection, the insured told the Rimkus engineer that a fire alarm had sounded in mid-February, 2019, without a fire and that it was determined that the wire had been pinched when an exterior wall trussed column member **buckled**. Four additional columns were checked and were found to have **buckled** as well." (Emphasis added)

47.   The foregoing facts were verified by the Rimkus engineer, and affirmed in his report at pages 5-6 as follows:

> "During the course of the site inspection on June 6, 2019, the following items and conditions were observed:

9

\*\*\*

• The walls at the truss supports had been opened (by others prior to Rimkus inspection) by cutting away the drywall in four places (photograph 6).

• Where the walls had been opened, the tube steel frame that supported the truss had **buckled** at the location where the bottom chord of the truss met the tube steel support (photograph 9). (Emphasis added)

\*\*\*

• A red fire alarm was present behind the buckled tube at the east wall. The **buckled** tube created a **pinch point** for the wire (photograph 11) (Emphasis added)

48.     The pinch point on the wire set off the fire alarm due to the **abrupt buckling/collapse!** (See, the Rimkus Report observations/findings at pages 5-6 for numerous other deficits caused by the weight of snow collapse, for example, sag at the ridgeline of the roof, separations and offsets in the drywall in several locations, the plumbness of the west and east walls, and bowing outward of the exterior east wall.)

49.     Mr. Gose, and others, will testify none of the foregoing conditions existed prior to the alarm and **abrupt collapse** due to the weight of the snow.

## YOUR CONCLUSIONS

50.     For all of the foregoing legal authority, facts, and the fair and the reasonable application of the Evanston applicable policy provisions, it is respectfully submitted that your July 27, 2019, and December 17, 2021 denials of Saddletree's claims were unreasonable, unfair and in bad faith. You are referred to the governing Wyoming legal authority cited above.

51.     Here, Markel/Evanston fails to deal fairly and in good faith with Saddletree, the insured, by refusing to pay the claims without proper cause, to compensate for a loss clearly covered by the policy. The insurer's failure to deal fairly and in good faith with insured by refusing, without proper cause, gives rise to a cause of action for tortious refusal to pay. To establish a bad faith claim, the insured need only show (1) the absence of any reasonable basis for

10

denying the claim, and (2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. I believe this to be the case, and that a jury would so find.

52.     I believe that Markel/Evanston has deliberately and deceptively misrepresented policy provisions to defeat coverage and impose burdensome requirements on Saddletree, including unnecessary litigation, legal fees and costs. All of the foregoing constitutes willful or wanton misconduct on Markel/Evanston's part justifying punitive/exemplary damages under Wyoming law.

53.     As noted, Saddletree does not have to prevail on its contract claims to prevail on its claims for breach of good faith and fair dealing under Wyoming law.

54.     Finally, I will specifically address two (2) points in your Conclusion section of the letter. It must be noted, however, that I dispute the entirety of your Conclusion for the foregoing reasons. I believe these two specific points go directly to the deliberate and deceptive misrepresentation of the policy provisions.

55.     First, you, on page 5 of your letter, assert policy Sections 3.a and 3.c justify denial of the policy claims. These provisions read as follows:

> "3.     This Additional Coverage – Collapse does not apply to:
>
> (a)     A building or any part of a building that is in danger of falling down or caving in;
>
> ***
>
> (c)     A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or exposure."

56.     Under standard rules of contract construction, all relevant provisions must be considered as a whole. Here, Section D.3.a. and c. must be considered in relation to Section D.1 which reads as follows:

> "D.1.     For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling

11

> down or caving in of…any part of a building with the
> result that the building … **cannot be occupied for its
> intended purposes.**" (Emphasis added)

57.     Section 3.a. and c. clearly relate to buildings which **have not been declared by a**

**professional structural engineer as not to be occupied for its intended purpose!** Here, due to

the numerous defects in the building, Rimkus Engineering concluded at page 8 of its Report as

follows:

> "Although the roof and walls were still intact, the frames in the
> walls that supported the trusses had localized areas where the
> steel tube members had buckled up to two inches from the
> vertical condition.    The buckling of those members is
> **considered a structural failure** and severely weakens the
> member capacity to carry loads.    Due to these conditions,
> Rimkus **recommends that the structure not be occupied** (for
> any purpose) **during any months where snow on the roof of
> the structure may occur.**" (Parenthetical material and
> emphasis added)

58.     The taking of Section 3.a. and c. out of context is intentionally misleading and

without cause and a misrepresentation of the policy provisions.

59.     My second point interrelates to the first point addressed above.    At page 5 of your

letter, you state in part as follows:

> "Finally, the definition of "abrupt collapse" also requires that
> as a result of an abrupt falling down or caving in of any part of
> a building at least part of the building" cannot be occupied for
> its intended purpose."    As stated above, Rimkus did not
> conclude that any **part** of the building could not be occupied
> for its intended purposes **during non-snow months.**    You
> recognize in your letter that the building recommended
> standing and that it could be occupied for its intended purpose
> **for at least the non-snow months.**    As a result, this
> requirement in the definition of "abrupt collapse" is not
> satisfied." (The emphasis on the phrase "for at least the non-
> snow months" is in the original; other emphasis added)

60.     The foregoing is the most egregious, disingenuous misrepresentation of a contract

I've ever seen. I believe it is the "smoking gun" that will tip the jury. I hope you will be prepared

to testify to this representation.

61.    Mr. Gose, and others, will testify that the cold, snowy months are when the use of an indoor community, social and recreational facility are at their peak and most financially productive. The Rimkus Report, at page 4, describes the "intended purpose" of the building as a "multi-purpose building" which is "used for weddings, conventions, multi-purpose town events and as an indoor archery range." Most, if not all of these "intended uses" occur during the snow months. Rimkus in effect condemned the building for occupancy.

## DISPOSITION

62.    I respectfully request that you, again, reconsider payment of Saddletree' claims as set forth herein, and in its October 23, 2021 Notice of Claims which is incorporated herein. I am willing to informally discuss this matter by phone or to communicate by e-mail.

If this matter is not resolved by Friday, January 21, 2022, an action will be filed seeking all available remedies, damages, fees and costs.

Sincerely,

/s/ *Ronald G. Schmidt*

Ronald G. Schmidt

RGS/ds
Enclosures
cc:    David Gose – via email
       Rimkus Consulting Group, Inc.
         (Attn: Bryan Baggeley - via email: expert@rimkus.com)
       Frontier Adjusters
         (Attn: Andy Schultz - via email at rapidcity@frontieradjusters.com)

13