

**FILED**

8:11 am, 3/17/23

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

SADDLETREE HOLDING, LLC,

      Plaintiff,

      vs.

EVANSTON INSURANCE
COMPANY, and MARKEL SERVICE,
INC.,

      Defendants.

Case No. 22-CV-89-NDF

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

On July 17, 2019 Defendant Evanston Insurance Company ("Evanston") disclaimed insurance coverage of damage to the building ("Building") owned by Plaintiff Saddletree Holding, LLC ("Saddletree"). Plaintiff brings claims for breach of the insurance contract ("Policy"), substantive bad faith, and procedural bad faith. ECF 49, p.2. The parties have each submitted motions for summary judgment, supporting memoranda, ECF 78, 79, 80, 81, and memoranda in opposition, ECF 82, 83. The Court heard oral arguments on March 14, 2023.

Plaintiff seeks partial summary judgment that their insured building has "collapsed" as the term is used in the Additional Coverage – Collapse provision of the Policy. ECF 79.

Defendant Evanston and its claims service manager, Defendant Markel Service, Inc. ("Markel"), seek summary judgment on all claims. ECF 81. For the reasons below, Defendants' motion for summary judgment is GRANTED and Plaintiff's complaint is DISMISSED. The Court does not need to reach Plaintiff's motion for partial summary judgment, and it is DENIED.

## I. Facts

The relevant facts, viewed in the light most favorable to Plaintiff, except where disputes are noted, are as follows:

In 2014, Saddletree, which is owned by David Gose, hired Dreams Carports & Buildings, Inc., ("Dreams") to construct the Building, an 11,900 square-foot metal building at 2739 Highway 116 N, Upton, WY.  ECF 79-1, 79-2.

The Building was intended for multipurpose public use, i.e., indoor archery, craft or gun shows, weddings, funerals, birthdays, reunions, anniversaries, and other recreational activities.  ECF 79-1, ¶ 3.

Saddletree's Building was insured by Defendant Evanston under policy number 2AA132775.  ECF 79-2.

Following a large snowstorm on January 20, 2019, the Building's fire alarm suddenly went off, but no fire was present.  ECF 79-1 at ¶5.  The alarm also sounded again after January 20, 2019, but the first time that it sounded was on January 20, 2019.  *Id.* at ¶6.  Defendants contend that the fire alarm did not sound until March 2019.  ECF 81-1 at 42:21-43:3, 52:2-4, 67:1-15, 87:24-88:1; ECF 81-3, ¶ 12.

By March 2019, the snow had melted and Mr. Gose noticed damage to the roof and walls.  ECF 79-1, ¶¶ 7, 8.

On May 2, 2019 Mr. Gose and his electrician cut out four areas of the Building's interior drywall revealing that the Building's steel columns had buckled 2 or more inches and that the buckling had pinched the fire alarm wire.  *Id*. at ¶¶ 9,10, 12.

On May 7, 2019 Mr. Gose filed a claim for damages and noted the date of loss as January 20, 2019.  *Id*. at ¶14, 15; *Id.* at p. 4.

Saddletree's claim was assigned to a claims service manager at Defendant Markel. ECF 79-3 pp. 2-3, 12-13.  Markel retained Andy Schultz of Frontier Adjusters to conduct a field inspection of the Building.  *Id.* at 17-19.  Schultz inspected the Building on May 15, 2019, observed "bent and warped structural members, [the] caved-in roof, and deflected roof trusses," and reported the findings to Defendant Evanston.  ECF 79-4, p. 8; ECF 81-5.

Defendants retained structural engineer Brian L. Baggaley who examined the Building on June 6, 2019.  ECF 81-7.  Defendants contend that, during the inspection, Baggaley advised Gose that "the structure of the [B]uilding was too weak."  ECF 81-1 at 20:7-22:10.

On July 27, 2019 Baggaley submitted his report, ECF 79-6.  It states that:

(1) The cause of the fire alarm was determined to have been a wire that had been pinched when a steel column "buckled." ECF 79-5, pp. 8, 9;

(2) There had been about 30 inches of ground snow during the winter of 2018/2019. *Id*. at p.8;

(3) The connection plate at the ridge of the truss had buckled outward 1/8 inch at some locations. *Id.* at p. 10;

(4) The roof had a downward deflection of approximately 6 inches. *Id.* at p. 68;

(5) There were "indications of damage to the roof support structure . . . in multiple locations." *Id.*;

(6) The "deflection of the roof and the buckling of the frame members supporting the roof trusses were indications of the [Building's] distress and failure." *Id.*;

(7) Although the roof and walls were still intact, the frames in the walls had localized areas where the steel tube members had buckled up to 2 inches from the vertical condition. *Id.*;

(8) The buckling of the steel tube members was a structural failure and "severely weakened the member capacity to carry loads." *Id.*;

(9) Because of the damage, the Building should not "be occupied during any months where snow on the roof of the structure may occur." *Id.*

Mr. Baggaley concluded that the damage was caused as a result of the Building being inadequately "designed and/or constructed" and, as a consequence, "the roof and support columns . . . buckled under the weight of snow during the 2018/2019 snow year." *Id*. at p. 6.

Mr. Baggaley supported his conclusions by reviewing the weather reports and seeing that, at the time the fire alarm sounded, there had been the equivalent of 13 pounds per-square foot of snow and "[a]s such, the roof structure failed under the snow loads." *Id.* at pp. 11-12.

 On July 27, 2019 Defendant Markel issued a denial letter to Plaintiff Saddletree on behalf of Defendant Evanston.  Defendant Markel explained that the cause of the loss was due to the Building's "improper/inadequate design and construction" being unable to support the snow load, and that under Policy Section B.2.d.(2) there was no coverage for a

Building that suffered damage resulting from any "hidden or latent defect" or "any quality in property that causes it to damage or destroy itself."  ECF 79-6, pp 1-3.  The claim denial letter did not explain why there was no coverage under the Policy's "Additional Coverage – Collapse" provision.  *Id.*  The letter also did not tell Mr. Gose that his Building was dangerous and should not be occupied, so the people of Upton tried to continue to occupy the Building.  ECF 79-1 at ¶16; ECF 79-3, pp. 23-24.

On September 27, 2019 Sean Durrant, then Plaintiff Saddletree's Counsel, wrote to Defendant Markel stating that Plaintiff "does not dispute the denial of the claim," and asked Markel to produce a copy of Baggaley's report, and any other material Markel relied upon in denying coverage, because Saddletree wanted to pursue a claim against Dreams. ECF 79-7.

Defendant Markel declined to produce the report because it was Markel's unwritten "protocol" not to do so.  ECF 79-9; ECF 79-3 p. 22.  Kraig Schilling, the commercial property claims manager who joined Markel the following year, testified that he was not aware of any such protocol, that requests for inspection reports are decided on a case-by-case basis, and that requests for reports coming from an insured's counsel would be reviewed by Markel's general counsel.  Schilling dep. pp. 26-29.

On December 6, 2019 Dreams' structural engineer, Omar Abu-Yasein, submitted his inspection report on the Building.  ECF 79-10.  The report revealed a "caved in roof and deflected roof trusses."  ECF 79-10.  Previously, on November 3, Abu-Yasein also emailed that the "frames are overstressed and in a collapsing stage," and that the Building

was "structurally unsound" and should not be used "unless temporary shoring is provided and a final fix is implemented."  ECF 79-11.  The temporary shoring was installed by Dreams in January 2020.  ECF 79; ECF 81.

On November 4, 2019, Durrant forwarded Dreams's advice to Plaintiff "to vacate the [Building] based on recommendations received from [Dreams's] engineer." ECF 81-14, p. 23; ECF 81-13.  Plaintiff contends that at this point Mr. Gose was informed that the Building was no longer stable to host activities for the people of Upton so he closed the doors and it is no longer being used for its intended purpose.  ECF 79-1, ¶¶ 16-17. Defendants contend that shortly after Baggaley inspected the Building in June 2019—about five months before Abu-Yasein's November 2019 inspection—Plaintiff had already "lock[ed] the Building's doors" and was not using it for anything other than storage. ECF 81-1 at 20:19-22:10, 61:11-18.

Ron Schmidt, Plaintiff's new counsel, hired Mike Albertson of Albertson Engineering to inspect the Building on February 6, 2020.  ECF 79-18.  Albertson submitted his report to Plaintiff's counsel on April 17, 2020.  ECF 79-12.  Albertson's findings were consistent with Baggaley and Abu-Yasein's findings.  ECF 79-12, ¶ 12.  Mr. Albertson also noted that a Building code official would likely "condemn the structure in its entirety and not allow for any occupancy or use of the facility."  *Id.* at p. 12.  Mr. Albertson recommended that the Building not be occupied at all.  *Id.*

On November 16, 2020 Plaintiff filed a lawsuit against Dreams and others, alleging that Dreams defectively designed and constructed the Building resulting in damage to the

Building.  ECF 81-3.  On March 23, 2021 the court entered default judgment against Dreams.  ECF 81-16.

On July 8, 2021 Plaintiff's counsel Schmidt wrote to Defendant Markel and again requested a copy of Baggaley's report.  ECF 79-1.  This time Defendant Markel agreed and disclosed it on August 10, 2021.  ECF 79-14.

Kraig Schilling, Markel's claims manager, distinguished the release of the report in 2021 as stemming from a request for the report to challenge the denial of coverage, while the denial in 2019 stemmed from a request for the report to sue a third party.  Schilling dep. pp. 26-29.

Plaintiff has "no idea" what it would have done differently if Defendants had provided the Baggaley Report in September 2019.  ECF 81-1 at 61:15-62:8.

On October 25, 2021 Plaintiff's counsel wrote to Defendant Markel and asked that it reverse its denial of coverage under, among other things, the Policy's "Additional Coverage – Collapse" provision.  ECF 79-15, pp. 7-11.

On December 17, 2021 Defendant Markel responded, without any additional engineering inspection, that there was no coverage under that provision because there was no evidence of an "abrupt collapse."  ECF 79-16.  Markel stated that although the fire alarm sounded when the wire had been pinched by a wall support that had "buckled," there was no evidence that it had occurred "suddenly."  ECF 79-16 pp. 4,5.  Markel also stated coverage was excluded for "a building that was still standing, even if it show[ed] evidence

of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion" so coverage was denied. *Id*.

On January 16, 2022 Plaintiff's engineer, Albertson, completed a supplemental report. ECF 79-12, p. 88. Plaintiff's counsel sent Defendant Markel the supplemental report stating that the buckling of the steel members "would have occurred in a nearly instantaneous manner," and that "[i]t [was] extremely likely that one of the trusses buckled first followed by some level of extremely rapid load redistribution causing other members to fail in a nearly instantaneous unzipping type of collapse." ECF 79-12 at 163-64.

Defendant Markel then re-engaged its engineer, Mr. Baggaley, to determine whether "there [had been] an abrupt falling down or caving in of any part of the Building." ECF 79-17. In his report dated March 17, 2022, Baggaley concluded that "the yielding and buckling of the tube steel element occurred gradually as snow accumulated on the roof and was not an instantaneous or abrupt failure." ECF 79-18, p. 2.

There is no evidence indicating that the Building has been inspected by any building officials or enforcement. Additionally, nobody has sued Saddletree; "[n]o one has been hurt inside the [B]uilding"; and "[n]o one's property was damaged inside the [B]uilding." ECF 81-1 at 63:14-25.

Plaintiff initiated this lawsuit on March 24, 2022. ECF No. 1-2.

## II. Terms of the Policy

Paragraph B.3 of the Covered Causes of Loss form in the Policy states:

"We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a.

8

through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss."

ECF 79-2 p. 124 at ¶ B.3.

Paragraph B.3.c. identifies the following excluded causes of loss:

Faulty, inadequate, or defective . . . (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction.

(Collectively "Faulty Design and Construction"). ECF 79-2, p. 124 at ¶ B.3.c; ECF 44, ¶ 58.

Paragraph D.2.d, titled Additional Coverage – Collapse, states:

We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building . . . if such collapse is caused by one or more of the following: . . . d. Use of defective material or methods in construction . . . if the abrupt collapse occurs after the construction . . . is complete, but only if the collapse is caused in part by: (2) One or more of the "specified causes of loss."

ECF 79-2, p. 127 at ¶ D.2.d.

The contract defines abrupt collapse, for purposes of the Additional Coverage – Collapse, to mean:

an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

*Id.* at ¶ D.2.1.

The specified causes of loss include "weight of snow." ECF 79-2, p. 130 at ¶G.2.

The Policy also articulates that the Additional Coverage – Collapse does not apply to:

a. A building or any part of a building that is in danger of falling down or caving in;

b. A part of a building that is standing, even if it has separated from another part of the building; or

c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

ECF 79-2, p 127 at ¶ D.3.

Paragraph D. of the Commercial Property Conditions of the Policy states:

No one may bring a legal action against us under this Coverage Part unless . . . The action is brought within 2 years

ECF 81-2, p. 22.

### III.  Standards of Review

The Court shall grant a motion for summary judgment if the movant has demonstrated that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citing *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)).

In considering a motion for summary judgment, the moving party has the burden of production and the burden of establishing that summary judgment is appropriate as a matter of law.  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).  If the movant does so, the nonmovant "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).  To defeat a motion for summary judgment,

the non-movant must show more than "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). "[E]vidence, including testimony, must be based on more than mere speculation, conjecture or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Unsubstantiated conclusory allegations carry no probative weight in summary judgment proceedings and do not create a genuine issue of material fact. *Id.* (quoting *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)).

Finally, in ruling on a motion for summary judgment, the Court may only consider evidence that is admissible at trial — inadmissible evidence should be disregarded. *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1207-08 (10th Cir. 2010).

## IV. Analysis

### A.   Breach of Contract

Plaintiff contends that it is entitled to summary judgment on the issue of collapse because the policy defines collapse in terms of an occupancy standard and that there is no question that the Building cannot be occupied for its intended purpose.[1]

---

[1] Plaintiff's complaint also raises a theory of coverage under paragraph B.3, the exclusion from general coverage for damage caused by Faulty Design and Construction. The theory is that the weight of snow is a covered cause of loss under and fits the exception to the exclusion for covered causes of loss that result from the Faulty Design and Construction. Plaintiff conceded at the hearing that the theory of coverage under paragraph B.3 is not viable. *See Travelers Indem. Co. v. Bd. of Cty. Comm'rs for Larimer Cty.*, No. 10-cv-02160-MSK-CBS, 2012 WL 1059776 (D. Colo. Mar. 29, 2012) (aff'd 508 F. App'x 733, 735 (10th Cir. 2013)) (holding that, under similar policy language and circumstances, a covered cause of loss results from Faulty Design and Construction only when the resulting loss is secondary and wholly separate from the defective property itself); *see also RK Mech., Inc. v. Travelers Prop. Cas. Co. of Am.,* No. 10-cv-02306-WJM-KMT, 2011 WL 3294921 (D. Colo. Aug. 1, 2011).

Defendants argue that they are entitled to summary judgment on the issue of collapse because Plaintiff cannot establish that there is substantial impairment to the Building's structural integrity now that "the installation of additional shoring resolved any concerns about the Building's structural integrity" and the additional shoring rendered the Building useful for its intended purpose.  ECF 83, p. 12, 19.  Defendants characterize the impairment as "ordinary" and the additional shoring as "ordinary maintenance."  *Id.* at p. 15.

Defendants additionally argue that they are entitled to summary judgment on the issue of collapse because the Building is still standing, because the damage was exclusively caused by Faulty Design and Construction rather than the weight of snow, and because the damage was not abrupt.

Defendants additionally contend that summary judgment on the breach of contract claim is appropriate because Plaintiff's claim is barred by the two-year limitations period in the Policy.   In response, Plaintiff argues that this Court has held that a two-year limitations period is unreasonable and thus unenforceable and cites to *Thompson v. Protective Ins. Co.*, 2013 WL 11834242, at *6 (D. Wyo. 2013).

The contractual limitations period is dispositive.  The damage occurred sometime between January and March 2019.  Plaintiff did not file this suit until March 2022, which is at least three years later and outside the contractual limitations period.

This Court explained in *Thompson*:

It is well settled that parties may agree to shorten the period for bringing an action and that such contractual periods are prima facie valid.  *Nuhome Investments, LLC*

12

*v. Weller*, 81 P.3d 940, 946 (Wyo. 2003).  However, the contractual period will not be enforced if the party opposing enforcement demonstrates that the clause is "unreasonable or based upon fraud or unequal bargaining positions."  *Id*. at 947 (citing *Durdahl v. Nat'l Safety Assocs., Inc*., 988 P.2d 525, 527-28 (Wyo. 1999).

*Thompson*, 2013 WL 11834242, at *6.

Plaintiff argues that the two-year limitations period is unreasonable because it would "effectively permit insurers to run the clock on the time available for filing suit by delaying settlement of any pending claims."  That was the circumstance this Court confronted in *Thompson* when it held that the limitations period was unreasonable*.  Id.*

Yet that is not what happened in this case.  Plaintiff reported the loss on May 7, 2019.  ECF 79-1.  On May 15, 2019 adjuster Bryan Schultz inspected the Building and reported findings to Defendant Evanston.  ECF 81-5.  On June 6, 2019 Defendant's structural engineer Bryan Baggaley inspected the Building and then he provided his report to Defendants on July 17, 2019.  ECF 81-7.  On July 27, 2019 Defendants denied the claim.  ECF 79-6.  Plaintiff's counsel told Defendants on September 27, 2019 that Plaintiff did not dispute the denial of the claim.  ECF 79-7.

Thus, there is no evidence that Defendant delayed or "ran-out the clock" on settling a claim.  Defendants' inspection and denial was reasonably timely and did not prevent Plaintiff from filing suit.  Plaintiff had sufficient information to file suit in November 2020 when Plaintiff filed suit against Dreams.  Plaintiff could have also filed this suit.  ECF 81-3, ¶¶ 6, 10-11, 13-19.

Plaintiff also points to Defendants' final denial letter in December 2021 as evidence of "running out the clock."  But here too, Evanston action was reasonably timely.  Plaintiff

requested reconsideration on October 25, 2021, and Defendants responded on December 17, 2021. Importantly, this request for reconsideration was made six months after the two-year limitations period had already run and was made only after Plaintiff's lawsuit against Dreams had already resulted in default judgment.

Plaintiff argues that Defendants should be estopped from asserting the limitations period because Defendants delayed litigation by not providing Baggaley's report. ECF 82, p. 4 (citing *Sweetalla v. State ex rel. Dep't of Workforce Servs.*, 448 P.3d 825, 831 (Wyo. 2019)). Plaintiff requested the report on September 27, 2019 and Defendants denied the request on October 10, 2019.

Plaintiff has not identified any authority indicating that the Defendants had a duty to provide the report to Plaintiff, just as this Court observed in the July 5, 2022 Order Granting Motions to Dismiss filed by Defendant Rimkus Consulting Group, Inc. and Defendant Frontier Adjusters. ECF 39. Moreover, Plaintiff wasn't precluded from filing suit before 2021 because Plaintiff could have, and in fact did, hire its own engineer in the spring of 2020, and could have, and did, file suit in November 2020. Plaintiff's problem is not that it couldn't file suit, it's that the suit it filed was against Dreams instead of the Defendants in this case.

At the hearing, Plaintiff argued that a jury could find that Plaintiff would have sued Defendant earlier if Plaintiff had received the report earlier, because when Plaintiff did receive the report in 2021 it sued Defendants within six months. Yet Plaintiff does not present any argument or facts indicating that something in the report would have caused

14

Plaintiff to sue Defendants Evanston and Markel instead of Dreams – there is no logical nexus between the contents of the report and the likelihood of an earlier suit against these Defendants.  Plaintiff has "no idea" what it would have done differently if it had the report earlier.  *See* ECF 81-1 at 61:15-62:8.

Accordingly, because the contractual limitations period was not unreasonable under the circumstances of this case, and Defendants are not estopped from asserting it, Defendants are entitled to summary judgment on Plaintiff's claim for breach of contract. The Court does not need to consider Plaintiff's motion for summary judgment or whether the damage was covered under the Policy.

B.     *Bad Faith*

Defendants argue that Markel is not a proper defendant because Markel was not a party to the insurance contract.  ECF 81, p. 14.  While this is true for the contract claim, Plaintiff is correct that, under Wyoming law, a claims administrator associated with the insurer may be liable to the insured for the tort of bad faith even though there is no privity of contract.  *Peterson v. Meritain Health, Inc.*, 508 P.3d 696, 705 (Wyo. 2022).  Defendant Markel's extensive involvement is more than sufficient to show that Defendant Markel is a claims administrator associated with Defendant Evanston.  So even though Defendant Markel did not contract with Plaintiff, it may still be liable to Plaintiff for the tort of bad faith.

1.  *Substantive Bad Faith*[2]

Establishing a claim of substantive bad faith for denying an insurance claim requires showing 1) the absence of any reasonable basis for denying a claim for benefits; and 2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim for benefits.  *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 825 (Wyo. 1994).

To satisfy the first factor, the insured must show "a reasonable insurer under the circumstances would not have acted as it did by denying or delaying payment of the claim." *Bergantino v. State Farm Mut. Auto. Ins. Co., 2021 WY 138, ¶ 16,* (quoting *Shrader*, 882 P.2d 813, 825).  "The test used in determining whether a claim was denied in bad faith is an objective one which questions whether the validity of the denied claim was not fairly debatable." *Id.*

"If a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duty of good faith and fair dealing." *Hatch v. State Farm Fire & Cas. Co.*, 842 P.2d 1089, 1093 (Wyo. 1992) (citing *McCullough v. Golden Rule Insurance Co.*, 789 P.2d 855, 860 (Wyo. 1990)). An insurer "is entitled to rely on the conclusion of the independent experts . . . unless there is a showing that there was collusion between the experts and [the insurer] or that the

---

[2] The two-year contractual limitations period does not apply to the claim of bad faith because the claim of bad faith sounds in tort, not contract.  *See Thompson*, 2013 WL 11834242, at *6 ("the Court observes Plaintiff's bad faith claim is not subject to the contractual terms of the . . .  Policy as this claim sounds in tort").  *See also Matlack v. Mountain W. Farm Bureau Mut. Ins. Co*., 44 P.3d 73, 81 (Wyo. 2002) ("[w]hile an insured may state claims for breach of contract and breach of the duty of good faith and fair dealing, the insured does not need to prevail on the contract claim to pursue the bad faith claim.")

experts knowingly made false reports. *Hatch*, 842 P.2d at 1093. "Conflicting opinions among experts regarding the cause of the [loss] is not a factual dispute and does not preclude granting summary judgment on the issue of 'fairly debatable.'" *Hatch*, 842 P.2d at 1094.

On January 16, 2022 Plaintiff's expert structural engineer, Albertson, completed a supplemental report indicating that the buckling of the steel members "would have occurred in a nearly instantaneous manner," and that "[i]t [was] extremely likely that one of the trusses buckled first followed by some level of extremely rapid load redistribution causing other members to fail in a nearly instantaneous unzipping type of collapse." ECF 79-12 at 163-64.

On March 17, 2022 Defendants' independent expert structural engineer opined that "the yielding and buckling of the tube steel element occurred gradually as snow accumulated on the roof and was not an instantaneous or abrupt failure." ECF 79-18, p. 2.

Plaintiff does not argue that there was collusion between Defendants and their expert. Accordingly, because Defendants are entitled to rely on the opinion of the independent expert, and because mere conflicting opinions between Defendants and Plaintiff do not create a factual dispute on the issue of "fairly debatable," Defendants are entitled to summary judgment on Plaintiff's claim for substantive bad faith.

### 2. *Procedural Bad Faith*

Even if the insurer has a "fairly debatable" reason for not paying the claim, it is procedural bad faith to "go beyond a reasonable denial of the claim and engage in

unreasonable or unfair behavior to gain an unfair advantage." *Bergantino*, 2021 WY 138, ¶ 18 (citing *Hatch*, 842 P.2d at 1099).  "An insurer may be liable for its unreasonable, oppressive, and intimidating claims practices in investigating, handling, or denying a claim, even though the denial was appropriate.  *Id.* (citing *Hatch*, 842 P.2d at 1099; *Shrader*, 882 P.2d at 828; *Sinclair Oil Corp. v. Republic Ins. Co.*, 967 F.Supp. 462, 465 (D. Wyo. 1997).

A claim for procedural bad faith may lie whether or not the insurer breached the insurance contract.  *Id.*  [T]he insured does not need to prevail on the breach of contract claim to prevail on the claim for breach of the duty of good faith and fair dealing." *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 18.  The tort of procedural bad faith may also be viable "even though the express terms of the insurance contract are honored by the insurer." *Hatch*, 842 P.2d at 1099 (citing *Darlow v. Farmers Insurance Exchange*, 822 P.2d 820 (Wyo. 1991)).

Among other things, the Court considers an insurer's adherence to industry standards or guidelines.  In *Peterson* the Wyoming Supreme Court held that there were questions for the jury when an expert opined that industry guidelines were not followed in thirteen areas, and that if they had been, the insurer would have conducted a more thorough investigation.  *Id.*  ("internal policies . . .  defeat[ed] a full and fair review of a claim."); *Peterson*, 2022 WY 54, ¶ 12.

Defendants argue that the Plaintiff has not identified a statutory, regulatory, or common law authority for Defendants' duty to provide the report or warn of a hazardous condition.  ECF 81, p. 21.  Defendants also argue that Plaintiff was not harmed by

Defendants' decision not to provide the report because Plaintiff already knew the Building was dangerous and because Plaintiff could have hired its own engineers.  ECF 81, p. 22. Defendants also argue that its conduct falls short of the litany of egregious conduct in *Hatch.*  842 P.2d at 1098.  ECF 81, p. 21.  Finally, Defendants argue that Plaintiff cannot prevail on its procedural bad faith claim as a matter of law because Plaintiff has not disclosed economic damages related to the failure to warn.  ECF 81, p, 23.  Defendant contended at the hearing that the reason the report was not initially disclosed in 2019 was because the report was requested so that the Plaintiff could sue a third party, and that the report was disclosed in 2021 because the Plaintiff requested it to challenge the denial of coverage.

Plaintiff argues that there are questions for the jury because Defendant Markel's initial denial letter it did not analyze or explain to the Plaintiff why there was no coverage under the additional collapse coverage, Markel refused to warn Plaintiff that the Building should not be used, Markel refused to provide Baggaley's report to Plaintiff because of some purported unwritten "protocol," and Markel issued a denial letter on the October 25, 2021 request for reconsideration before conducting any additional engineering study.

As an initial matter, there is no question that Defendants appropriately hired independent adjustors and engineers and timely evaluated the claim in 2019 and timely evaluated Plaintiff's request for reconsideration in 2021.  Then in 2022, when confronted by Plaintiff's new supplemental engineering report indicating that the damage was abrupt,

Defendants again engaged their structural engineer and again timely evaluated the question.

Additionally, Plaintiff has raised no expert evidence indicating whether Defendants followed industry guidelines and Plaintiff has not identified any particular theory of procedural bad faith – even considering the twenty examples enumerated in *Hatch*. *See Bergantino*, 2021 WY 138, ¶ 19; *Hatch*, 842 P.2d at 1097-98 (quoting Glenn E. Smith, Understanding the New Tort of First Party Bad Faith in *Wyoming: McCullough v. Golden Rule Insurance Company*, XXVI Land & Water L.Rev. 225, 244-68 (1991)).

On the other hand, and viewed in the light most favorable to Plaintiff, Defendants apparently failed to even consider the additional collapse coverage during its original investigation, even though the coverage was at least implicated by the facts of this case – numerous courts have considered similar coverage under similar circumstances. *See e.g. Malbco Holdings, LLC v. AMCO Ins. Co.*, 629 F. Supp. 2d 1185, 1193 (D. Or. 2009); *Stamm Theatres v. Hartford Cas. Ins. Co.*, 93 Cal. App. 4th 531, 541-42, 113 Cal. Rptr. 2d 300, 307 (2001) *Naabani Twin Stars, LLC v. Travelers Cos.*, 497 F. Supp. 3d 1011, 1019 (D.N.M. 2020); *Mount Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co.* 808 F. Supp. 2d 1322 (N.D. Ga. 2011). Defendants did not discuss the additional collapse coverage in their initial denial letter and apparently failed to investigate the dispositive question whether the damage was "abrupt" until after prompted by Plaintiff in October 2019 and confronted with Albertson's supplemental engineering report in 2022.

Moreover, although this Court has held that the Defendants' refusal to provide the Baggaley report did not influence the timing of this suit for purposes of the two-year contractual limitations period, a reasonable jury could find that Defendants unfairly or oppressively concealed information by withholding the Baggaley report – especially considering the special relationship between the insurer and insured and the importance of the information to the insured property's condition and safety. *See Hatch,* 842 P.2d at 1099 (finding insurer may have violated its duty of good faith and fair dealing, when among many other egregious circumstances, the insurer withheld information about the fire investigation from the insured and withheld exculpatory information from prosecutors) (citing *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (Ariz. 1986) ("[t]he expert in *Rawlings* testified, among other things, that it was customary to turn over investigative reports to the insured); *see also Darlow*, 822 P.2d at 827 ("[t]he insurer's duty is to 'exercise intelligence, good faith, and honest and conscientious fidelity to the common interest' of the insured as well as the insurer and give at least equal consideration to the interest of the insured, and, if it fails to do so, the insurer acts in bad faith") (quoting *Western Casualty and Surety Co. v. Fowler*, 390 P.2d 602, 606 (Wyo. 1964)).

Ultimately, however, Plaintiff failed to respond, with evidence in the record, to Defendants' contention that Plaintiff has not disclosed economic damages related the claim for procedural bad faith.  Available damages for a tortious breach of the duty of good faith and fair dealing include damages for harm to pecuniary interests and damages for emotional distress. *Farmers Ins. Exch. V. Shirley*, 958 P.2d 1040, 1046 (Wyo. 1998).

However, "to recover damages for emotional distress, the insured must allege that as a result of the breach of the duty of good faith and fair dealing, the insured has suffered substantial other damages, such as economic loss, in addition to the emotional distress." *Id.*

There is no remaining claim tied to payment under the Policy – the breach of contract and substantive bad faith claims are dismissed by this order and those damages are off the table. The evidence shows that Plaintiff has not been sued and no one has been injured and no property has been damaged in the Building. With this, Defendants have met their burden of production. Plaintiff, however, has failed to "bring forward specific facts showing a genuine issue for trial" on the issue of economic damages stemming from the claim of procedural bad faith. *See Kannady,* 590 F.3d at 1169. Plaintiff's assertion at the hearing that additional attorney's fees and engineering costs are proper damages does not support the claim. Those costs rely on an intermediate finding that Plaintiff was entitled to coverage and that it was the procedural bad faith that caused the delayed or denied payment. But Plaintiff only points to the initial denial of the report as causing those damages – and as discussed above, Plaintiff does not point to anything in the report that would have changed the timing of Plaintiff's underlying claim for coverage. Without economic damages, emotional damages are not available, and the claim cannot be sustained. *See Shirle*y, 958 P.2d at 1046. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for procedural bad faith.

**V.  Conclusion**

Therefore, it is HEREBY ORDERED:

Defendants' motion for summary judgment, ECF 80, is GRANTED, Plaintiff's motion for partial summary judgment, ECF 78, is DENIED, and Plaintiff's Amended Complaint, ECF 44, is DISMISSED with prejudice.

Consistent with the above, the Clerk's office shall enter final judgment for Defendants and close the case.

IT IS SO ORDERED this 16th day of March, 2023.

_____

NANCY D. FREUDENTHAL
UNITED STATES SENIOR DISTRICT JUDGE